**WRIGHT GROUP ARCHITECTS– PLANNERS, P.L.L.C.,**
Appellant,

v.

**James T. PIERCE, Jr., Appellee.**

**No. 05–09–01233–CV.**

Court of Appeals of Texas,
Dallas.

April 19, 2011.

Rehearing Overruled May 19, 2011.

Barbara Thompson Hale, Gary W. Blanscet, Jeffrey Dwayne Smith, Blanscet, Sutherland, Hooper & Hale, L.L.P., Addison, TX, for Appellant.

James W. Wilson, Rapier, Calve and Wilson, Allen, TX, for Appellee.

Before Justices FITZGERALD, LANG–MIERS, and FILLMORE.

## OPINION

Opinion By Justice LANG–MIERS.

Wright Group Architects–Planners, P.L.L.C. appeals from a take-nothing judgment rendered after a bench trial. We conclude that Wright Group conclusively proved its breach of contract claim. We reverse the trial court's take-nothing judgment, render judgment for Wright Group on its breach of contract claim, and remand to the trial court for further proceedings consistent with this opinion.

James T. Pierce, Jr. approached Terrance Wright of Wright Group Architects–Planners, P.L.L.C. about providing architectural and design services for a proposed eight-story condominium development in Galveston, Texas. The development was to be completed in two phases and was to include two residential buildings, walking trails, areas for children, formal gardens, a family pool, an adult pool, an outdoor spa, a chip/putting green, and sand volleyball and tennis courts. Wright prepared a proposal for services and sent the contract to Pierce. Pierce signed the contract after which Wright Group began working on the schematic design. This lawsuit was filed after Pierce failed to pay for Wright Group's services. Wright Group alleged causes of action for sworn account, breach of contract, and quantum meruit against Pierce personally. Pierce asserted two affirmative defenses: (1) he was not liable

personally because he signed the contract in an agency capacity, and (2) appellant cannot enforce the contract because it was not signed by an agent of Wright Group Architects–Planners, P.L.L.C. The parties tried the case to the trial court, which rendered a take-nothing judgment against Wright Group. Although requested, the trial court did not make findings of fact and conclusions of law. We abated the appeal and ordered the trial court to make findings and conclusions, which it did.

In five issues, Wright Group challenges the trial court's findings and conclusions that Pierce signed the contract in an agency capacity, that Wright Group Architects–Planners, P.L.L.C. was not a party to the contract, and that Wright Group did not prove its breach of contract claim or, alternatively, its quantum meruit claim. Pierce did not file a brief in this Court.

### STANDARDS OF REVIEW

A trial court's findings of fact in a nonjury trial carry the same force and dignity as a jury's verdict on jury questions. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 436–37 (Tex.App.-Dallas 2010, no pet.). We apply the same standards in reviewing the legal and factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Kahn*, 308 S.W.3d at 437 (citing *Rich v. Olah*, 274 S.W.3d 878, 883 (Tex. App.-Dallas 2008, no pet.)).

When considering a challenge to the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. If the evidence would permit reasonable and fair-minded people to reach the finding under review, the legal sufficiency challenge fails. *Id.* When considering a challenge to the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and manifestly unjust. *Id.* We review a trial court's conclusions of law de novo to determine whether the trial court drew the correct legal conclusions from the facts. *Kahn*, 308 S.W.3d at 437; *Landerman v. State Bar of Tex.*, 247 S.W.3d 426, 431 (Tex. App.-Dallas 2008, pet. denied).

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Kahn*, 308 S.W.3d at 437 (citing *LaCroix v. Simpson*, 148 S.W.3d 731, 734 (Tex.App.-Dallas 2004, no pet.)). We are not a fact-finder and may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if the evidence would support a different result. *Kahn*, 308 S.W.3d at 437 (citing *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.)). When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the verdict if a reasonable person could do so. *City of Keller*, 168 S.W.3d at 821.

### DISCUSSION

■ In an amended answer, Pierce alleged that he was not liable personally on the contract because he signed it as an agent for Galveston Hidden Treasure Management, Inc. The trial court concluded that Pierce conclusively established that he signed the contract in an agency capaci-

ty for Galveston Hidden Treasure Management, Inc. In its first issue, Wright Group argues that there is no evidence to support the trial court's conclusion that Pierce acted as an agent for Galveston Hidden Treasure Management, Inc. when he signed the contract with Wright Group.[1]

This issue requires us to construe the contract. The parties agreed below and the trial court found that the contract was not ambiguous. We agree that the contract is not ambiguous. The construction of an unambiguous contract is a question of law, which we review de novo. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999). Our primary concern is to determine the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To determine the parties' intent, we must examine the entire agreement and give effect to all its provisions so that none are rendered meaningless. *Id.* This is often referred to as the "Four Corners Rule," which means that we determine the intention of the parties from the instrument as a whole and not from its isolated parts. *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex.2002) (per curiam). We do not consider the parties' present interpretations of the agreement. *Calpine Producer Servs., L.P. v. Wiser Oil Co.,* 169 S.W.3d 783, 787 (Tex.App.-Dallas 2005, no pet.). And we are not concerned about the parties' subjective intent. *Id.*

■■■ It is well-settled that the law does not presume agency. *Sw. Bell Media, Inc. v. Trepper,* 784 S.W.2d 68, 71 (Tex.App.-Dallas 1989, no writ). When an agent seeks to avoid personal liability on a contract he signs, it is his duty to disclose

that he is acting in a representative capacity and the identity of his principal. *See Latch v. Gratty, Inc.,* 107 S.W.3d 543, 546 (Tex.2003) (per curiam); *Trepper,* 784 S.W.2d at 71–72. To establish the affirmative defense of agency, a party must prove he made these disclosures. *Trepper,* 784 S.W.2d at 71. A person who fails to disclose that he is signing a contract as an agent may be held liable on the contract. *Id.* If the contract clearly shows on its face that it is the obligation of the person who signed it, parol evidence is inadmissible to show that the person intended only to bind his principal. *Lassiter v. Rotogravure Comm., Inc.,* 727 S.W.2d 8, 9 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). If the contract is uncertain about whether it was intended to bind the principal or the agent, parol evidence of the circumstances surrounding its execution is admissible to show the real understanding. *Id.*

The contract involved in this case is two pages long and is in the form of a letter addressed to:

/s/Mr. Jim Pierce, President
GHTM, Inc.
(Address)

Throughout, it refers to the contracting parties as "Wright Group" and "Owner." It does not refer to Galveston Hidden Treasure Management, Inc. And the only reference to "GHTM, Inc." is in the inside address. Pierce's signature block appears as below, with handwritten words shown in italics:

Accepted:

/s/Jim Pierce

Pierce signed the contract simply "Jim Pierce." He did not write in a corporate

1. Wright Group specifically challenges the following conclusion of law:

 51. Defendant prevailed on his affirmative defense of agency because the acts and/or omissions of Defendant of which Plaintiff complains occurred, if at all, in the course and scope of Defendant's performance of his duties as an authorized agent of Galveston Hidden Treasure Management, Inc.

or company name and did not indicate that he was signing the contract in a representative capacity.[2]

When an individual signs a contract without indicating that he is signing in a representative capacity, he is liable on the contract. *See Kahn,* 308 S.W.3d at 438; *Caraway v. Land Design Studio,* 47 S.W.3d 696, 699–700 (Tex.App.-Austin 2001, no pet.). It was not Wright Group's duty to inquire or discover the principal for whom Pierce allegedly acted. *See Lake v. Premier Transp.,* 246 S.W.3d 167, 171 (Tex.App.-Tyler 2007, no pet.).

The contract is unambiguous that Pierce signed the contract in his individual name only. We conclude that the contract shows on its face that Pierce did not sign the contract in a representative capacity and that the trial court erred by concluding otherwise. We sustain appellant's first issue.

Pierce also alleged in an amended answer that Wright Group Architects–Planners, P.L.L.C. was not a party to the contract because the contract was not signed by an authorized officer of that firm. At trial, Pierce stipulated that he and Wright signed the contract, but he argued that "it'll be up to the Court to determine if they signed in the proper capacity or not. . . ." The trial court concluded, among other things, that Wright Group Architects–Planners, P.L.L.C. was not a party to the contract and lacked privity to enforce it because its authorized agent did not sign the contract. Wright Group challenges these conclusions in its second issue.[3]

A court can determine as a matter of law whether an agency relationship exists by reviewing the agreement between the parties. *See Ward v. Prop. Tax Valuation, Inc.,* 847 S.W.2d 298, 300 (Tex.App.-Dallas 1992, writ denied); *Trepper,* 784 S.W.2d at 71; *Lassiter,* 727 S.W.2d at 9. When it is apparent from the entire agreement that an officer of a corporation signed the contract on behalf of the corporation as an agent of the corporation, it is the corporation's contract. *Ward,* 847 S.W.2d at 300.

As we previously stated, the contract involved in this case was written in the form of a letter. At the top of the letter was the following:

*WRIGHT GROUP* Architects–Planners, PLLC
(Street address) (telephone numbers)

This heading is the only place in the contract that referred to the full legal name of the firm; the body of the contract referred only to "Wright Group." The contract was signed by Terrance Wright as "Principal, Wright Group" (handwritten words indicated in italics):

/s/Terrance J. Wright
Terrance J. Wright, A.I.A., N.C.A.R.B.
Principal, Wright Group

Viewing the contract as a whole, the contract disclosed complete information from which Pierce could identify the principal, Wright Group Architects–Planners,

---

**2.** Pierce also admitted that "GHTM, Inc." did not exist at any time.

**3.** Wright Group specifically challenges the following conclusions of law:
 45. Plaintiff is not a named party to the Contract nor was the Contract signed for or on behalf of Plaintiff by an authorized individual.
 46. Plaintiff is not a party to the Contract and therefore lacks privity to enforce the terms of the Contract against Defendant.
 47. Wright failed to disclose the true identity of Wright's purported principal and, as a result, Wright executed the Contract personally and in his individual capacity.

P.L.L.C., for whom Wright acted as agent. *See Ward,* 847 S.W.2d at 300; *Trepper,* 784 S.W.2d at 71; *Lassiter,* 727 S.W.2d at 9. The name "Wright Group Architects–Planners, P.L.L.C." was easily identifiable at the top of the contract. *See Robertson v. Bland,* 517 S.W.2d 676, 678 (Tex.Civ. App.-Houston [1st Dist.] 1975, no writ). And Wright clearly signed the contract in a representative capacity when he signed it "Principal, Wright Group." *See Ward,* 847 S.W.2d at 300; *Trepper,* 784 S.W.2d at 71; *Lassiter,* 727 S.W.2d at 9; *Bland,* 517 S.W.2d at 678. Although the contract did not expressly define "Wright Group" to mean "Wright Group Architects–Planners, P.L.L.C.," construing the agreement as a whole, we conclude that he signed it in a representative capacity on behalf of Wright Group Architects–Planners, P.L.L.C. *See Bland,* 517 S.W.2d at 678–80. Consequently, we further conclude that the trial court's conclusions of law that

Wright Group Architects–Planners, P.L.L.C. was not a party to the contract and was not entitled to enforce it are erroneous as a matter of law. We sustain appellant's second issue.

In its fourth issue, Wright Group also argues that it established its damages for breach of the contract as a matter of law.[4],[5]

The trial court concluded that Wright Group offered "no evidence of probative value" to support its damages claim. The court concluded that the damages claim was "wholly speculative or conjectural" and was "based solely on Wright's unsupported and self-serving estimate of total construction costs for phase one of the Project." The court concluded, alternatively, that Wright Group was entitled to damages in the amount of $30,000. This dollar amount was based on a "target construction cost of $100 per square foot" and

---

4. It was undisputed that Pierce breached the contract. He stipulated that he signed the contract and testified that he did not pay invoices sent to him by Wright Group.

5. In this issue, Wright Group challenges the evidence to support the following findings and conclusions:

*Findings of Fact*
33. The amount claimed by Plaintiff in this suit is for the first of two phases based on Wright's unsupported estimate that the Project's construction cost would be $78 million.
34. Wright overestimated the Project's construction cost for phase one to increase Plaintiff's damage claim.
35. Defendant never agreed to a $78 million construction cost for the project.
36. Galveston Hidden Treasure Management, Inc. retained the right to approve the final Project construction cost.
38. Wright's work on the Project ended at the schematic design portion of phase one representing 15 percent [sic] of the total fee. Based on Defendant's target construction cost of $100 per square foot, the total construction cost for phase one

of the Project comes to $20 million. At four percent of construction costs, Wright's total fee for completing phase one would have been approximately $800,000.00. For the schematic design work, Wright would have been entitled to approximately $120,000. Offsetting the $90,000 paid by Galveston Hidden Treasure Management, Inc., Wright would be entitled to approximately $30,000 had he filed suit to enforce the Contract and prevailed on his claim. (citation to the record omitted).

*Conclusions of Law:*
49. Plaintiff offered no evidence of probative value to support its claim for recovery of $258,919.66 in damages against Defendant on any of Plaintiff's three claims of sworn account, breach of contract or quantum meruit. As a matter of law, Plaintiff's claim for damages is wholly speculative or conjectural being based solely upon Wright's unsupported and self-serving estimate of total construction costs for phase one of the Project. Alternatively, Plaintiff is only entitled to damages in eth [sic] total amount of $30,000. (internal footnote omitted).

a total construction cost for phase one of $20 million.

We address each of the court's findings in turn and conclude that the evidence supporting them is either legally or factually insufficient.

The contract stated that Wright Group would be paid a professional fee for phase one of the project in the amount of 4% of total construction costs. Phase one of the project included schematic design, the services at issue in this lawsuit. The evidence showed that J.E. Dunn, an estimator hired by Pierce, estimated total construction costs for the project Pierce wanted to build at $78,750,000. Sixty percent of the total construction costs was devoted to phase one of the project. The evidence showed that, at 60% of the total, Wright Group's fees for phase one of the project were estimated at $1,890,000.

Wright Group presented invoices for its schematic design services showing that Pierce owed it $258,919.66 at the time of trial. Wright testified that those fees were based on an estimate he made as well as Dunn's estimate of over $78 million. When Wright tried to explain how he arrived at his estimate, Pierce asked, "But the real estimate came from Dunn, correct?" Wright answered, "Correct." Pierce later asked Wright whether Wright Group's "fee was based on the estimate of construction [sic] by Dunn" and he answered, "Correct, the [$]78 million." Wright testified that he and Pierce discussed the $78 million and that Pierce did not object to that amount. It was undisputed that Pierce hired Dunn, and it was undisputed that Pierce did not receive a written estimate from anyone that was less than the $78 million estimated by Dunn.

Pierce testified that he did not agree to the $78 million figure and that there were no "concrete construction costs" that were developed for phase one. He said there

were "preliminary estimates" of construction costs "based on certain parameters that we gave to the estimator. . . ." The evidence showed that the "preliminary estimate" for the entire project was Dunn's estimate of $78,750,000. Wright Group sent Pierce an email in April 2007 showing the breakdown of its fees based on Dunn's estimate. Pierce did not object to the numbers in the email and, in fact, paid some of the invoices.

Pierce testified that he never complained to Wright Group about the amount being billed for the schematic design work

> because we didn't have a firm construction figure. . . . *[W]e had estimates from J.D.* [sic] *Dunn that were in that range* to do a building in the way that we thought we were going to do it in the beginning. Further down the line, things changed because costs had to come down, but *in the beginning that's where the numbers were at.*

(emphasis added). He testified that he began investigating construction costs in the area while Wright Group was working on the schematic design. He said he wanted to try to get construction costs down to about $100 per square foot, and that he told Wright that the $78 million figure "was going to be a high number" and would have to be adjusted. But he also testified that the number was not adjusted because "we just didn't have a figure to adjust it to." He said they would have adjusted the figure "[a]fter we went through schematic design and were starting to go toward construction" because that was the time "when we would have had it nailed down, because we would have had all the vendors nail down their numbers." Pierce testified that with construction costs at $100 per square foot, the construction costs for phase one would be approximately $20 million and Wright Group's professional fees would be about

$800,000. Fifteen percent of that amount would be for the schematic design services. He said that the cost per square foot using the $78 million figure was about $200, not the $100 that he was "shoot[ing] for." Although he testified he was hoping to reduce the per-square-foot costs, he also testified that he did not question or object to the invoices sent by Wright Group.

 Viewing the evidence in the light most favorable to the trial court's findings, it shows that Pierce hoped to bring construction costs down to about $100 per square foot. But there is no evidence to support the trial court's finding that the damages claimed by Wright Group were "based on Wright's unsupported estimate that the Project's construction cost would be $78 million." The evidence showed that the $78 million estimate, upon which Wright's invoices were based, came from Pierce. There is also no evidence that "Wright overestimated the Project's construction cost for phase one to increase Plaintiff's damage claim." Pierce offered no evidence to support this finding. We conclude that the evidence is legally insufficient to support these findings.

 We also conclude that the evidence is factually insufficient to support the trial court's finding that "Defendant never agreed to a $78 million construction cost for the project." Pierce testified that he did not agree to the $78 million estimate, but other evidence showed that the estimate came from his own estimator and that he never objected to the estimate. It was undisputed that Pierce paid invoices based on the $78 million estimate and that he never objected to the invoiced amounts. Although Pierce testified he hoped to reduce the project's total cost, he testified

that the original estimate was never adjusted. Having reviewed all the evidence, we conclude that the evidence supporting the trial court's finding that Pierce did not agree to the $78 million project cost is so weak and so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

 Finally, we conclude that the evidence supporting the trial court's finding that Wright Group's fees should be $30,000 and calculated based on the "target construction cost of $100 per square foot" is factually insufficient.[6] Pierce agreed to pay Wright Group for phase one services at an amount equal to 4% of total construction costs. Pierce's estimate of total construction costs was $78,750,000. The evidence showed that Wright Group invoiced Pierce based on Pierce's own estimate and that $258,919.66 remained unpaid. Pierce testified that he was not concerned about how the fee structure had been established because he "was worried about other things at the time and mainly getting some financing for the project."

Pierce testified that he hoped to reduce construction costs to $100 per square foot, but that estimate was based solely on his investigation of construction costs in the area, which he testified ranged from $78 per square foot to over $200 per square foot, depending on the type of project. He did not introduce any evidence that the "target construction cost of $100 per square foot" was realistic based on the range of construction costs for the area. And he testified that the actual costs would not be "nailed down" until after the schematic design phase was completed and they "were starting to go toward construc-

6. At $100 per square foot, Wright's fees for phase one would be $800,000. The schematic design fee was 15% of the fees for phase one, or $120,000. The evidence showed that Pierce had paid approximately $90,000, leaving a balance of $30,000 based on the trial court's findings.

tion." Pierce testified that the project "never even got close to construction," and it was undisputed that the services for which Pierce did not pay were for the schematic design phase. Pierce admitted that the project began as "a pretty elaborate building." But there was no evidence showing that the building plans had been revised while Wright Group was working on the schematic design. And Pierce admitted that he did not object to the invoices, that he paid some of them, and that the construction costs were never reduced because "we just didn't have a figure to adjust it to."

Based on our review of all the evidence, we conclude that the evidence supporting the trial court's finding that Wright Group's fees were $120,000 for the schematic design services based on a "target construction cost of $100 per square foot" is so weak and so against the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

The trial court concluded that Wright Group's "claim for damages is wholly speculative or conjectural being based solely upon Wright's unsupported and self-serving estimate of total construction costs for phase one of the Project." Because we have concluded that the factual findings supporting the court's conclusion of law are without support in the evidence, we further conclude that the trial court's conclusion is erroneous as a matter of law. We sustain appellant's fourth issue.

Based on our resolution of issues one, two, and four, we do not need to reach issue three concerning the quantum meruit claim.

Wright Group prayed in this Court for attorney's fees of $16,470.50. The trial court heard testimony concerning Wright Group's attorney's fees and made a finding that Wright Group "stipulated a reasonable fee through trial of this cause is $7,500.00...." The trial court did not award attorney's fees to Wright Group because the court concluded that Wright Group did not establish its breach of contract claim. Wright Group did not challenge the trial court's finding regarding the amount of attorney's fees.

### CONCLUSION

We reverse the trial court's judgment and render judgment for Wright Group Architects–Planners, P.L.L.C. in the amount of $258,919.66 for its breach of contract claim and $7,500.00 for its attorney's fees through trial of this cause. We remand this cause to the trial court for further proceedings consistent with this opinion.