AFFIRM; Opinion issued February 6, 2013.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00246-CV

## IN THE MATTER OF THE ESTATE OF J. B. PILKILTON, DECEASED

On Appeal from the County Court at Law No. 1
Grayson County, Texas
Trial Court Cause No. 2009-1-166P

# MEMORANDUM OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion By Justice Lang-Miers

This appeal involves a will contest concerning the estate of J. B. Pilkilton (Pilkilton). The appellants are Catherine C. Pilkilton, Fred Pilkilton, Jr., and Roger Pilkilton, the family of Pilkilton's brother who predeceased him. Appellees Cynthia Marie Smith and Jeffery Allen Pilkilton are Pilkilton's grandchildren. Appellants contested a will executed by Pilkilton dated February 11, 2007 and were proponents of a will executed by Pilkilton dated May 8, 2006. In four issues, Appellants argue that the trial court erred by finding that the 2007 will was executed with the requisite formalities, that Pilkilton had testamentary capacity at the time he executed the 2007 will, that it was not collaterally estopped from determining whether Pilkilton had testamentary capacity, and that Appellees did not exercise undue influence. Because all dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.2(a), 47.4. We affirm.

## BACKGROUND

Pilkilton died in 2009. A week after Pilkilton's death, Pilkilton's sister-in-law Catherine C. Pilkilton filed an application for probate of a self-proved 2006 will and for issuance of letters testamentary. The residuary beneficiary of the 2006 will was Fred Pilkilton, Sr., Pilkilton's brother and Catherine's husband. When her husband, Fred, Sr., died in February 2007, Catherine became the residuary beneficiary. The 2006 will named Roger and Fred Pilkilton, Jr., Catherine and Fred Pilkilton, Sr.'s children and Pilkilton's nephews, as contingent residuary beneficiaries.

Ten days after Catherine filed, Pilkilton's granddaughter Cynthia Marie Smith filed an application for probate of a self-proved 2007 will and for issuance of letters testamentary. The residuary beneficiaries of the 2007 will were Pilkilton's grandchildren, Smith and Jeffery Allen Pilkilton. The 2007 will specified that Appellants were not to receive any of Pilkilton's estate.

Appellants filed a contest to the 2007 will in County Court at Law No. 1 in Grayson County. After a bench trial, the court ordered that the 2007 will should be admitted to probate, that Appellants acted in good faith and with just cause in their efforts to have the 2006 will admitted to probate, and that Catherine, the designated independent executrix under the 2006 will, be allowed attorney's fees and expenses out of Pilkilton's estate.

The court subsequently issued findings of fact and conclusions of law, including:

1. The proponents of the Last Will and Testament of J. B. Pilkilton dated February 11, 2007, proved that said will was properly executed with all the formalities and solemnities required by law.

2. J.B. Pilkilton had the necessary testamentary capacity to execute a will on February 11, 2007, and this court is not collaterally estopped from finding such capacity by any previous ruling or finding of the Grayson County Court at Law, No. 2, in the guardianship proceeding, to-wit, CN 2007-56G.

3. The Last Will and Testament of J. B. Pilkilton dated February 11, 2007, should be admitted to probate.

. . . .

5. The contestants failed to prove by a preponderance of the evidence that at the time of the execution of the February 11, 2007, will, J.B. Pilkilton was unduly influenced by any person which affected the terms of said will.[1]

Appellants filed a motion for new trial, which the court denied. This appeal followed.

## STANDARD OF REVIEW

Appellants argue that there was legally insufficient evidence to support the findings that the 2007 will was properly executed and that Pilkilton had testamentary capacity. They also argue that there was factually insufficient evidence to establish that the 2007 will was properly executed, that Pilkilton had testamentary capacity, and that he was not unduly influenced.

We review the legal and factual sufficiency of the evidence to support a trial court's findings by the same standards we apply when reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.). In reviewing a challenge to the legal sufficiency of the evidence, we consider evidence that supports the finding if a reasonable fact-finder could have considered it and disregard contrary evidence unless a reasonable fact-finder could not have disregarded it. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *Wright Grp. Architects-Planners, P.L.L.C. v. Pierce*, 343 S.W.3d 196, 199 (Tex. App.—Dallas 2011, no pet.). We will sustain a legal sufficiency challenge "when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a

---

[1] Appellants argue on appeal that Appellees had the burden to establish an absence of undue influence, not that the trial court erred by applying the incorrect burden of proof.

vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Akin, Gump*, 299 S.W.3d at 115 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence is no more than a scintilla if it is "'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

In reviewing a challenge to the factual sufficiency of the evidence, we consider all of the evidence in the record, both supporting and contradicting the challenged finding, and will set aside the finding only if we determine that the evidence supporting the finding is so against the great weight and preponderance of the evidence as to make the finding clearly wrong and manifestly unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Prabhakar v. Fritzgerald*, No. 05-10-00126-CV, 2012 WL 3667400, at *4 (Tex. App.—Dallas Aug. 24, 2012, no pet. h.).

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Wright Grp.*, 343 S.W.3d at 199. We are not a fact-finder and may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if the evidence would support a different result. *Id.* When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the finding if a reasonable person could do so. *See City of Keller*, 168 S.W.3d at 821; *Wright Grp.*, 343 S.W.3d at 199.

## PROPER EXECUTION

In their first issue, Appellants argue that Appellees did not produce legally or factually sufficient evidence to establish that the "2007 will was executed with the requisite formalities[.]"

### Applicable Law

In probate proceedings, it is the court's duty to determine that the instrument offered for probate meets the statutory requisites of a will before admitting the will to probate. *In re Estate of*

*Hudson*, No. 05-11-00008-CV, 2011 WL 5433689, at *3 (Tex. App.—Dallas Nov. 10, 2011, no pet.) (mem. op.). The requirements include that two or more credible witnesses must attest to it and subscribe their names to the will in their own handwriting in the presence of the testator. *See* TEX. PROB. CODE ANN. § 59 (West Supp. 2012). Any changes made in an original, properly-executed will are ineffective unless the changes were made with the formalities required to make a will. *Pullen v. Russ*, 209 S.W.2d 630, 636 (Tex. Civ. App.—Amarillo 1948, writ ref'd n.r.e.).

One who offers a will with a self-proving certificate executed and attached makes out a prima facie case that the will has been properly executed and may have the will admitted to probate if the other requirements of section 88 of the probate code are fulfilled. *Estate of Hudson*, 2011 WL 5433689, at *3; *see* TEX. PROB. CODE ANN. § 88 (West 2003) (stating proof required for probate of a will); *In re Estate of Rosborough*, 542 S.W.2d 685, 688 (Tex. Civ. App.—Texarkana 1976, writ ref'd n.r.e.). The opponent to the probate of the will must put on proof to rebut the proponent's prima facie case. *Estate of Hudson*, 2011 WL 5433689, at *3; *Estate of Rosborough*, 542 S.W.2d at 688. The proponent may then chose to stand on the prima facie case or may choose to go forward with evidence. *Estate of Hudson*, 2011 WL 5433689, at *3; *Estate of Rosborough*, 542 S.W.2d at 688.

### Appellants' Position

Appellants argue that the evidence establishes that the attorney who drafted the 2007 will made changes to the 2007 will to correct a mistake after Pilkilton, the witnesses, and the notary purportedly signed the will. Appellants claim that, because the 2007 will offered for admission to probate did not contain any errors, "the only possible conclusion from the evidence presented by the [Appellees] was that the pages containing the mistakes were simply and erroneously replaced by the corrected pages with there being no evidence provided by the [Appellees] that a re-execution of the

document ever occurred." As a result, Appellants argue, Appellees did not establish that the will offered for probate was signed by the witnesses in the presence of the testator Pilkilton as statutorily required, nor did they establish the terms of the 2007 will before the changes were made.

## Appellees' Position

Appellees argue that the trial court correctly found that they carried their burden to prove proper execution. They argue that the attorney who drafted the will, Michael McGraw, may have had trouble remembering "the mechanics of how [a] mistake got corrected in relation to the signing ceremony" but McGraw was clear that the changes were made before the will-signing ceremony took place. They contend that the testimony of all people present at the will-signing ceremony was consistent and that "no one testified that the signing took place before all changes were made; either at trial, or in deposition."

## Discussion

In his deposition, McGraw testified that he remembered leaving Pilkilton's home on February 11, the day the will was executed, to go to his office to make a correction to the will and returning at least two hours later. McGraw also testified that the signed will was the final version. At trial, he was not clear about when he made the correction but testified that the will was signed after the correction was made. Maurine Potts and Ruby Smith, witnesses to the execution of the will, and Stephanie McKinstry, the notary public, either could not recall or differed in their recollection about whether McGraw left Pilkilton's house on February 11 and then returned with a corrected will.

Appellants claim that the evidence was legally and factually insufficient because there were conflicts in the testimony about whether and when corrections were made to the will. Although their accounts vary, however, as to whether, when, and how the purported correction to the will took place, no one testified that the execution of the 2007 will took place before all corrections were

made. And regardless of whether there were conflicts in the evidence, it was the province of the judge, as fact-finder, to resolve conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 820; *White v. Harrison*, No. 05-10-01611-CV, 2012 WL 6191348, at *5 (Tex. App.—Dallas Dec. 12, 2012, no pet.); *Austin v. Weems*, 337 S.W.3d 415, 427 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (jury, as fact-finder, was judge of contradictory evidence, including conflicting deposition and trial testimony).

Consequently, we conclude that claimed conflicts in the evidence did not render the evidence insufficient and that the evidence is legally sufficient to support the finding that the 2007 will was properly executed. Additionally, we conclude that the finding is not so against the great weight and preponderance of the evidence that it makes the finding clearly wrong and manifestly unjust. As a result, we also conclude that the evidence is factually sufficient to support the finding of proper execution. We resolve Appellants' first issue against them.

## TESTAMENTARY CAPACITY

In their second issue, Appellants argue that Appellees did not produce legally or factually sufficient evidence to support the finding that Pilkilton had testamentary capacity at the time he executed the 2007 will.

### Applicable Law

A testator has testamentary capacity when the testator has sufficient mental ability to understand that he is making a will, the effect of making a will, and the general nature and extent of his property. *Long*, 196 S.W.3d at 464. He must know his next of kin and the natural objects of his bounty and the claims upon them. *Id.* He must also have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id.*

–7–

Proponents of a will have the burden to prove testamentary capacity. *Seigler v. Seigler*, 391 S.W.2d 403, 404 (Tex. 1965); *Schindler v. Schindler*, 119 S.W.3d 923, 931 (Tex. App.—Dallas 2003, pet. denied). In determining whether a testator had testamentary capacity, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Long*, 196 S.W.3d at 464–65. But evidence of the testator's state of mind at other times can be used to prove the testator's state of mind on the day the will was executed if the evidence demonstrates that a condition affecting his testamentary capacity was persistent and was likely present at the time the will was executed. *Id.* at 465.

## Appellants' Position

Appellants argue that the evidence—including evidence of Pilkilton's "existing dementia and deteriorating health due to age" and his "having suffered a sever[e] closed head injury" about two weeks before he executed the 2007 will—establishes that Pilkilton did not have testamentary capacity. Appellants claim that medical records "reflected that the Decedent was suffering from dementia which was exacerbated by the closed head injury, which left him confused, disoriented, and unable to comprehend his business, including the business of making and executing a Will."

## Appellants' Evidence

Appellants' expert witness, Dr. Myron Weiner, a geriatric psychiatrist, conducted a post-mortem diagnosis of Pilkilton based upon medical records and attorney ad litem reports, transcripts, and court orders from the guardianship proceeding. Among the medical records that he reviewed were records dated from the day Pilkilton suffered a head injury in late January 2007 through the day after he executed the 2007 will in mid-February 2007. These records refer to Pilkilton's confusion, dementia, lack of orientation as to either person, time, or place, and cognitive decline. Weiner concluded that Pilkilton did not have testamentary capacity when he executed the will on February

11. Weiner stated that he "specifically relied mostly on the nurse's notes" and stated that the nurses' notes for February 11 were "[c]onceivabl[y]" inaccurate because they indicated that Pilkilton was confused during the day, evening, and night, but Pilkilton was away from the nursing home facility with family from 8:00 a.m. to 8:00 p.m. that day. Weiner also stated that the other "clear evidence" of incapacity on February 11, 2007 that he reviewed was a nurse's note from that date that said that Pilkilton was confused at times, but he admitted that "the flip side of that [was] that he's not confused at times[.]"

Dr. John Tyson, Pilkilton's personal physician, testified: "From the injuries that he had, I just don't think that he had the capability to execute that [will], and that's my medical judgment." Tyson testified that he had no reason to believe that a note dated February 1, 2007 by Dr. Ori Lotan, who treated Pilkilton after his fall, stating that Pilkilton had "behaviors consistent with incipient dementia" was inaccurate. Tyson testified that incipient dementia is "dementia that comes and goes" and it usually means that the patient "will have episodes of the dementia and then he may have episodes of clearing." And he testified that "if the people who observed him on February 11th when he signed the Will said he seemed fine to them, seemed like the same old J. B. we've known for fifty years," their impressions would "be an indication that if he had dementia at all it was incipient dementia[.]"

James Harris, a long-time friend of Pilkilton's, described how, prior to Pilkilton's head injury, "his short-term memory seemed to be getting a little bad" and how "after his accident he went down hill very quickly." Harris also testified that he did not see Pilkilton between January 25, 2007 and March or April 2007.

Harold Franks was a long-time acquaintance of Pilkilton's. Franks testified that Pilkilton did not know who Franks was when Franks visited Pilkilton in the hospital and the nursing home after

his fall, and Franks did not think Pilkilton knew that he was in the hospital. Franks also testified that he "was looking at [Pilkilton] from the choir loft" at church on February 11. He said that Pilkilton "[j]ust wasn't himself[,]" did not have his usual smile, and "starred [sic] off into space." But Franks did not talk with Pilkilton that day. When asked whether Pilkilton led a prayer during the church service that day—as Appellee Smith testified had happened—Franks responded that he did not recall Pilkilton leading a prayer, and that "[t]he pastor never had a member of the congregation say prayers." But Franks said that Pilkilton "might have done it when [Franks] was not in the service[.]"

Thomas Redwine, who was Pilkilton's attorney ad litem in the guardianship proceeding, testified that he saw Pilkilton twelve to fifteen times after he was appointed, and that Redwine "never saw him in a situation where he didn't need a guardian." But Redwine also testified that he first saw Pilkilton on February 13, 2007, the day that Pilkilton had moved to a new nursing home and that the move would "have some effect on maybe a person's mental state."

Appellants argue that the doctors' reports about examinations of Pilkilton conducted six days before and five days after he executed the 2007 will, reports by Redwine in Pilkilton's guardianship proceeding, and court orders in that guardianship proceeding showed that he lacked testamentary capacity. Appellants also contend that Potts, a witness to the execution of the will, testified at the guardianship proceeding on March 15, 2007 that Pilkilton was in better condition at that guardianship proceeding—when a judge ruled Pilkilton was incompetent—than he was in February 2007 when he signed "estate planning documents" and that her testimony supports their position. In addition, Appellants argue that testimony by those present at the 2007 will execution reflected that there were no questions asked of or declarations made by Pilkilton to indicate that Pilkilton "knew the nature and extent of his property" or "the natural objects of his bounty" at the time he executed

the will. *See Long*, 196 S.W.3d at 464.

## Appellees' Position

Appellees argue that the trial court correctly found that Pilkilton "had the necessary testamentary capacity to execute a will on February 11, 2007." Appellees state that Appellants "could produce no evidence, nor did they produce a single witness [with one exception who saw Pilkilton that day but did not speak with him] that testified that they saw J.B. Pilkilton on February 11, 2007" or that testified "that at the time the decedent signed his Last Will and Testament on February 11, 2007, he lacked the capacity required by law." Appellees state that, in contrast, Appellees "produced eight witnesses that testified to Mr. Pilkilton's mental state on February 11, 2007." They also argue that the testimony by five witnesses presented by Appellants to establish Pilkilton's lack of capacity had weaknesses and inconsistencies. They contend that "[t]he circumstantial evidence presented by Appellants was simply not enough to overcome the direct eyewitness testimony presented by Appellees in meeting their burden at trial on capacity."

## Appellees' Evidence

Ruby Smith, who witnessed the 2007 will and had been Pilkilton's close friend and companion for years, testified that Pilkilton's mental condition on February 11 "was as good as it was when [she] met him in 2000 or whenever it was." She further testified that Pilkilton "was angry that day, but his mental capacity—he knew what he was doing[.]" She testified that he "knew the people that he wanted to take care of in the Will and he knew what properties he had" and that "he understood the effect of his making a new Will."

Maurine Potts, the other witness to the 2007 will, had known Pilkilton for "sixty or so" years. She testified that, on February 11, he knew what his property consisted of, who his family members were, and that he was signing a will. She testified that Pilkilton called her and asked her to come

to his home to witness his will. She also testified that, on February 11 at Pilkilton's home, Pilkilton "told [her] what he wanted to do", which was that "[h]e was making a Will, and he wanted [her] to witness it."

Michael McGraw, the attorney who drafted the will, testified that Pilkilton "was aware that he was signing his last Will and Testament[,]" "that he knew the effect of making a new Will[,]" and that he "knew what he wanted done with the Will[.]" McGraw also testified that—"at the time the Will was signed"—"[Pilkilton] knew who he was. He knew where he was. He knew who was in the room."

Stephanie McKinstry, the notary, was also present at the execution ceremony. She testified that Pilkilton appeared "to be of a normal state of mind" on February 11, did not appear to be confused, and was "very clear headed." She had known Pilkilton since she was a young girl, and she testified that she did not notice any difference in "the way he talked or his thought processes" on February 11 from when she had talked with him on prior occasions. She testified that Pilkilton "understood what was being told to him" and what he was signing, and that "he knew what he was saying, he knew what he was angry about, and he knew what he wanted." She testified that she would not have notarized his signature if she "felt like he didn't know what he was signing[.]"

Appellee Cindy Smith, Cindy's husband, Stan Smith, and Cindy and Stan's son, Danny Smith, all testified that Pilkilton had normal conversations with them on February 11. Danny testified that, when he talked with Pilkilton right after he executed the will, Pilkilton did not seem disoriented. Cindy testified that, before and after Pilkilton signed the will, he "appear[ed] normal in all respects in terms of his state of mind[.]"

### Discussion

Because the pivotal issue is whether the testator had testamentary capacity on the day the will

was executed, we first review the evidence about Pilkilton's testamentary capacity on that day. *Long*, 196 S.W.3d at 464–65. Only four people other than the testator were present in the room when he reviewed and signed the will. Each of those four people testified that they believed he knew what he was doing and that he was aware that he was signing his will. McGraw and Ruby Smith testified that he knew the effect of signing the will, Potts and Ruby Smith testified that he knew what his property consisted of, Potts and McGraw testified that he knew who his family members were, and Ruby Smith testified that "he knew the people that [sic] he wanted to take care of in the Will[.]"

James Harris said that he saw Pilkilton at church that day and that he did not seem to be himself, but Harris did not talk to him. A nurse's note in records from the facility where he lived stated that, on the day he executed the will, he was confused at times. But, as Appellants' expert witness testified, the "flip side" of this note was that Pilkilton was not confused at times. And because Pilkilton was away from the facility from eight o'clock that morning to eight o'clock that night, the accuracy of the nurses' notes indicating that he was confused during the day, evening, and night was questionable. Additionally, Cindy Smith, Stan Smith, and Danny Smith testified that he appeared normal.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony and resolves conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819–20; *Wright Grp.*, 343 S.W.3d at 199; *White*, 2012 WL 6191348, at *5. The fact that there are conflicts in the evidence does not mean that the evidence is not sufficient to support the findings. *See McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 885 (Tex. App.—Dallas 2007, pet. denied) (stating "opinions are not legally insufficient simply because the opinions contradict one another"). Although evidence was presented that tended to show that he had dementia, Alzheimer's disease, and other conditions that might affect his mental capacity, the only

testimony from people who actually saw him and talked to him that day supported the court's finding that he had the necessary testamentary capacity that day.

We conclude that the evidence is legally sufficient to support the finding that Pilkilton had testamentary capacity at the time that he executed the 2007 will. In addition, we conclude that the finding is not so against the great weight and preponderance of the evidence that it makes the finding clearly wrong and manifestly unjust. Consequently, we also conclude that the evidence is factually sufficient to support the finding that Pilkilton had testamentary capacity. We resolve Appellants' second issue against them.

### COLLATERAL ESTOPPEL

In their third issue, Appellants argue that the trial court erred in finding that collateral estoppel did not preclude the court from determining whether Pilkilton had testamentary capacity to execute a will on February 11, 2007 because another court in a guardianship proceeding "previously held that the Testator did not have the necessary testamentary capacity to execute a Will on February 11, 2007."

### Applicable Law

Collateral estoppel prevents the relitigation of identical issues of law or fact that were actually litigated and were essential to the final judgment in a prior suit. *Texas Dept. of Pub. Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 817 (Tex. App.—Dallas 2012, no pet.). When a party seeks to assert the bar of collateral estoppel, the party "must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002) (quoting *Sysco Food Servs.*,

–14–

*Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994)).

## Factual Background

On February 13, 2007, two days after the execution of the 2007 will, Appellant Fred Pilkilton, Jr. filed an application in the County Court at Law of Grayson County to be appointed temporary guardian of Pilkilton's person and estate. He claimed that Pilkilton was "totally incapacitated" and alleged that Pilkilton had "expressed in a written Durable Power of Attorney that it is his preference that [Fred, Jr.] manage his estate and thus [Fred, Jr.] would have a preference to serve as the temporary guardian." He also alleged that Jeffery Pilkilton and Smith had approached Pilkilton on or around February 8, 2007 while Pilkilton was incompetent and obtained Pilkilton's signature on a power of attorney "for the purposes of wrongfully taking control of [Pilkilton's] person and estate." He contended that Jeffery Pilkilton and Smith were "taking possession and control of both the Person and the financial assets of [Pilkilton], by use of . . . invalid instruments" including "a General Power of Attorney and possibly a General Power of Attorney for Health Care." He claimed that, "[i]n order to protect [Pilkilton] from these wrongful actions, a Temporary Guardian needs to immediately be appointed."

Smith filed a contest to Fred, Jr.'s application for appointment stating that she had "been selected as guardian by J.B. Pilkilton . . . and this court must enforce that choice." She also alleged that "the Power of Attorney the applicant is seeking to have enforced was revoked on February 7, 2007[,]" and that "J.B. Pilkilton signed a new power of Attorney granting the authority to Cynthia M. Smith." In addition, Smith claimed that appointment of Fred, Jr. as Pilkilton's guardian would not be in Pilkilton's best interest, and that she would be better qualified.

After a hearing, the County Court at Law No. 2 issued an Order Appointing Temporary Guardians on March 16, 2007 that (1) determined there was "substantial evidence that" Pilkilton was

"an incapacitated person" and in need of a temporary guardian to protect his estate and person; (2) appointed Fred Pilkilton, Jr. as temporary guardian of Pilkilton's person and Bank of Texas, N.A.[2] as temporary guardian of his estate; (3) found that Smith was disqualified to serve as temporary guardian because her conduct during Pilkilton's incapacity "demonstrate[d] that Ms. Smith [was] not capable of properly and prudently managing and controlling [Pilkilton] or of protecting [Pilkilton's] interests and welfare[.]"

The following month, Fred Pilkilton, Jr. and Bank of Texas, N.A., as temporary guardians of Pilkilton's person and estate, filed an application to make the temporary guardianship permanent. The applicants claimed that Pilkilton was "'totally incapacitated' as defined by Texas law." After a hearing, the County Court at Law No. 2 issued an Order Making Temporary Guardianship Permanent on May 11, 2007. The court found, "J. B. Pilkilton is totally without capacity and lacks the necessary capacity as provided by the Texas Probate Code to care for himself and to manage his individual property as a reasonably prudent person, based on reoccurring acts or occurrences within the last six-month period, and that a full guardianship of both the person and estate of J. B. Pilkilton, the incapacitated person, should be granted." The court appointed Fred, Jr. as guardian of Pilkilton's person and Bank of Texas, N.A. as guardian of his estate.

### Appellants' Position

Appellants argue that "the issue of J. B. Pilkilton's mental capacity to execute estate planning type documents on or after February 8, 2007, was actually litigated and determined by the fact finder in the Guardianship proceeding" and "is identical to the issue in this Will Contest proceeding as to whether J. B. Pilkilton had the necessary mental or testamentary capacity to execute the purported

---

[2]The Order Appointing Temporary Guardians referred to Bank of Texas Trust, but the Application to Make Temporary Guardianships Permanent and the Order Making Temporary Guardianships Permanent referred to Bank of Texas, N.A. For consistency, we refer to the entity as Bank of Texas, N.A.

February 11, 2007 Will." Appellants contend that the other court found "that J. B. Pilkilton was without mental capacity during the time that the Appellee, Cynthia M. Smith, alleges he validly executed both the purported February 8, 2007 Power of Attorney, and the February 11, 2007 purported Will" and that this finding was essential to the outcome of the guardianship proceeding.

## Appellees' Position

Appellees argue that the trial court correctly found that collateral estoppel did not apply because the issue in this will contest—Pilkilton's testamentary capacity on the day that he executed the 2007 will—was not identical to the issue litigated in the guardianship proceeding, was not fully and fairly litigated in the guardianship proceeding, and was not essential to that court's judgment. Appellees concede that the guardianship court found that Pilkilton lacked capacity generally, but argue that the court did not rule on the question of Pilkilton's capacity on February 11 at the time he executed the will. Appellees argue that the guardianship court found only that Pilkilton lacked capacity to execute a preference of guardian on February 8, 2007, and that it did not find, as Appellants allege, that Pilkilton lacked capacity to execute "estate planning documents" on or after February 8, 2007. Appellees also argue that the court's order finding that Pilkilton warranted a guardianship "'based on reoccurring acts or occurrences within the last six-month period' per Probate Code Section 684" was not—as Appellants argue—a finding that Pilkilton "was completely without capacity for six months prior" to the guardianship hearing. *See* TEX. PROB. CODE ANN. § 684(c) (West 2003). Additionally, they argue that the issue of Pilkilton's capacity was not fully and fairly litigated because, at the temporary guardianship hearing, Appellees "were not afforded an equal opportunity to present facts" and, at the permanent guardianship proceeding, the court decided the motion for permanent guardianship "as if it were uncontested, because of a defect in the pleadings."

–17–

## Discussion

A finding of incapacity in a guardianship proceeding is different from a finding of a lack of testamentary capacity in a will contest. *See Evans v. Allen*, 358 S.W.3d 358, 366–69 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (stating "a testator under a guardianship does not necessarily lack testamentary capacity to execute a will"); *Stephen v. Coleman*, 533 S.W.2d 444, 447 (Tex. Civ. App.—Fort Worth 1976, writ ref'd n.r.e.) (finding, when testator was placed under guardianship after the date that he executed his will, that because "there was no adjudication that the testator was incompetent on the date that the will was signed[,]" then "there was no presumption that the testator did not have testamentary capacity on the date he signed the will"); *Clement v. Rainey*, 50 S.W.2d 359, 359 (Tex. Civ. App.—Texarkana 1932, writ ref'd) (stating that a person under a guardianship is not necessarily incompetent to make a will). And the court in the guardianship proceeding did not determine that the testator did not have testamentary capacity on February 11. Consequently, the issue involved in this will contest, Pilkilton's testamentary capacity on February 11, 2007, is not identical to the issue that was fully and fairly litigated and essential to the judgment in the prior guardianship proceeding. *See Petta*, 44 S.W.3d at 579; *MGA*, 358 S.W.3d at 817. Because of that, we do not need to address the other element of collateral estoppel.

We conclude that the trial court did not err in finding that the court was not collaterally estopped from determining whether Pilkilton had testamentary capacity at the time he executed the 2007 will. We resolve Appellants' third issue against them.

### UNDUE INFLUENCE

Appellants argue that the trial court erred in finding that Appellees did not exercise undue influence over Pilkilton at the time he executed the 2007 will because there was factually insufficient evidence to support that finding.

–18–

## Applicable Law

While testamentary incapacity indicates the want of intelligent mental power, undue influence indicates the existence of a testamentary capacity subjected to and controlled by a dominant influence or power. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Long*, 196 S.W.3d at 466–67. The party contesting the execution of a will generally has the burden of proving undue influence. *See Rothermel*, 369 S.W.2d at 922; *Quiroga v. Mannelli*, No. 01-09-00315-CV, 2011 WL 944399, at *5 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.). The contestant must prove the (1) existence and exertion of an influence (2) that subverted or overpowered the testator's mind at the time he executed the testament (3) so that the testator executed a testament that he would not otherwise have executed but for such influence. *Rothermel*, 369 S.W.2d at 922; *Long*, 196 S.W.3d at 467. Evidence of a fiduciary relationship between the testator and a proponent of the will, however, raises a presumption of undue influence and, in that circumstance, the proponent has the burden to produce evidence to show an absence of undue influence. *Spillman v. Spillman's Estate*, 587 S.W.2d 170, 172 (Tex. Civ. App.—Dallas 1979, writ ref'd n.r.e.); *Price v. Taliaferro*, 254 S.W.2d 157, 163 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.) (stating, where contestant alleges undue influence and fiduciary relationship existed, "the burden rests on the devisee to show the fairness of the transaction by appropriate evidence"). But this "presumption is not evidence of something to be weighed along with the evidence." *Spillman*, 587 S.W.2d at 172.

Exertion of undue influence cannot be inferred by opportunity alone. *Rothermel*, 369 S.W.2d at 923; *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied). There must be some evidence that the influence was not only present, but in fact exerted in connection with the making of the will. *Rothermel*, 369 S.W.2d at 923; *Cotten*, 169 S.W.3d at 827. Although weakness

–19–

of mind and body produced by infirmities of disease, age, or otherwise may be considered as material in establishing the testator's physical incapacity to resist or the susceptibility of his mind to an influence exerted, it does not establish that his mind was in fact overpowered or subverted at the time the will was executed. *See Rothermel*, 369 S.W.2d at 923; *Long*, 196 S.W.3d at 467; *Cotten*, 169 S.W.3d at 827. Usually the exertion of undue influence is subtle "and by its very nature usually involves an extended course of dealings and circumstances." *Rothermel*, 369 S.W.2d at 922. But not every influence exerted by one person on another's will is undue. *Id.* Influence is not undue unless the testator's free agency was destroyed and the testament produced expresses the will of the person exerting the influence. *Id.* Even if one requests, entreats, or importunes another to execute an instrument that makes a favorable disposition, the entreaties and importunities will not render the instrument invalid based on undue influence unless they were so excessive that they subverted the will of the maker. *See id.* Undue influence may be exerted through—among other ways—force, duress, intimidation, excessive importunity, or deception used to try to subvert or overcome the will of the testator and induce the testator to execute the instrument contrary to his will. *Id.*

### Appellants' Position

Appellants argue that "evidence and circumstances, either alone or when coupled with the presumption that the [Appellees] unduly influenced the Testator as a result of the existence of a fiduciary relationship, demonstrate" that Appellees exercised undue influence over Pilkilton at the time he executed the 2007 will. They contend that this evidence and these circumstances include: (1) Pilkilton's weakened physical and mental condition made him susceptible to undue influence by Appellees; (2) Smith arranged a meeting with Pilkilton and attorney McGraw so that Pilkilton could make a new will, Appellees were present while Pilkilton and attorney McGraw discussed preparation of the will, and Appellees were present and exerted control over Pilkilton during the execution of

–20–

the 2007 will; (3) Appellees were involved in the "planning, preparation, and execution of various estate planning documents" concerning Pilkilton; (4) there were earlier wills in which Pilkilton left his property "primarily to [Appellants], totally to the exclusion of [Appellees,]" which Appellants assert was "[e]vidence that the testator's real desires were different from those expressed in the [2007] will"; and (5) Pilkilton "was easily persuaded or influenced to change the terms of his Will to comply" with Appellees' suggestions or the suggestions of "their agents acting in concert with them" as shown by attorney McGraw's deposition testimony.

Appellants contend that Appellees "swept in on" Pilkilton within days after he suffered "a serious brain injury that left him fully incapacitated" and, while Pilkilton was in this incapacitated state, Appellees obtained the 2007 will and other "estate planning documents." Appellants contend that Appellees arranged for the attorney, used close friends as witnesses and a family member as notary,[3] "sequestered the Testator for 12 hours," and attempted to use McGraw's sister as a medical expert to establish Pilkilton's capacity.[4] Appellants also argue that McGraw represented Appellees individually, as reflected in a rule 11 agreement filed in the guardianship proceeding, and that he "acted in consort with the [Appellants] in unduly influencing the Decedent to change the testamentary disposition of his estate by executing the Purported 2007 Will."

### Appellees' Position

Appellees argue that the trial court correctly found that Appellees did not exert undue influence over Pilkilton. Appellees state that "[i]t is undisputed that there was evidence of a fiduciary relationship between the testator and one Appellee" and that, if Appellees had the burden

---

[3]The notary McKinstry was Appellee Cindy Smith's sister; they shared the same mother. McKinstry was not related to Pilkilton.

[4]Dr. Patricia Sharkey was McGraw's sister. Sharkey testified as a witness for Appellees, but was not a retained expert.

to establish a lack of undue influence, they "clearly met that burden." Citing *Spillman*, 587 S.W.2d at 172, they contend that the presumption of undue influence—when a fiduciary relationship exists—only establishes the burden of producing evidence. Appellees contend "that the trial court weighed the evidence presented by both sides, and that was all Appellants were entitled to."

Appellees argue that they presented evidence that (1) Pilkilton "was not someone who could be easily influenced"; (2) Pilkilton played dominoes often after his fall, which Appellees contend demonstrated that he did not have "a weakness of mind"; (3) Pilkilton and Appellees had a good relationship; (4) the 2007 will made a natural disposition of Pilkilton's property; (5) Appellants' actions caused Pilkilton to be angry and decide to draft a new will that did not leave property to Appellants; (6) at Pilkilton's request, Cindy Smith arranged for McGraw to meet with Pilkilton for assistance in recovering lost property, not to execute a will; (7) during Pilkilton's meeting with McGraw, Pilkilton initiated the idea of making another will; and (8) McGraw "isolated the decedent while they discussed the Will[.]" Appellees contend that Pilkilton's detailed conversation with McGraw about whom he wanted to receive his property and what they should receive "is sufficient evidence in itself to establish that this Will was the product of the testator['s wishes, and no one else's." They also contend that, although Appellants raise "concerns about Mr. McGraw later representing the Appellees in the guardianship proceedings, there was absolutely no evidence that he was acting as Appellees' agent in making the new Will." In addition, Appellees argue that events over the short time period between Pilkilton's hospitalization after a fall on January 25, 2007 and his execution of a power of attorney designating Smith to be his attorney in fact on February 7, 2007, and his execution of the 2007 will on February 11, 2007 do not qualify as "an extended course of dealings" that, as the supreme court stated in *Rothermel*, is usually involved in undue influence. *See Rothermel*, 369 S.W.2d at 922.

## Discussion

There is evidence that it was Pilkilton's idea to make the 2007 will and that Pilkilton talked to McGraw about whom he wanted to receive his property. There is also evidence that Pilkilton wanted to make a new will because he was angry with Appellants—who were the beneficiaries under the 2006 will—for taking his property after his fall in late January 2007. The attorney, McGraw, testified that Pilkilton "wanted to change the Will because he didn't want [Fred, Jr. and Roger] to get anything in the Will." And Appellants' expert Dr. Weiner—when asked how "the fact that the testator was very hurt and angry with his earlier heirs [would] weigh in on your opinion of undue influence"—stated that "[i]t would weigh in favor of due influence."

Ruby Smith, who was a witness to Pilkilton's execution of the will and his long-time companion, testified that "[y]ou didn't influence J. B. on anything because he was very stubborn and hard headed, and if he made up his mind about something that he was going to do, he did it, and [Appellees] did not influence him one way or the other." Likewise, Potts, who had known Pilkilton for decades, testified that Pilkilton was "definitely" a man who made his own decisions and knew what he wanted. The two witnesses to the will, the notary, and the lawyer all testified that he appeared to know what he was doing and what he wanted.

Additionally, the evidence was that Appellee Smith arranged for Pilkilton to meet with attorney McGraw for purposes of getting Pilkilton's property back from Appellants. Smith checked Pilkilton out of a nursing home for the day on February 11, 2007 and accompanied Pilkilton to church, lunch with family members and friend Ruby Smith, and then to Pilkilton's home where he executed the 2007 will. Although Appellees were in the home when the will was executed, they both testified that they were not in the room with Pilkilton when the will was executed. The record also shows Pilkilton had a history of making new wills, and that he had disinherited Smith in a prior will.

Although doctors and nurses noted Pilkilton's confusion and disorientation in his hospital records from the day of his fall in late January 2007 through the day after he executed the 2007 will and witnesses testified that he was confused and not himself, the evidence also supported Appellees' position that he was not unduly influenced. A finding of undue influence cannot be inferred from Appellees' opportunity to exert undue influence alone. *Rothermel*, 369 S.W.2d at 923. And there was no evidence that Appellees' influence was not only present but was in fact exerted with respect to the making of the testament itself. *Id.* In this case, the judge as fact-finder heard all of the evidence, resolved conflicts in the evidence, and found against Appellants. *See City of Keller*, 168 S.W.3d at 820; *White*, 2012 WL 6191348, at *5. We conclude that the evidence is factually sufficient to support the court's finding. We resolve issue four against Appellants.

## CONCLUSION

We resolve Appellants' four issues against them and affirm the judgment of the trial court.

ELIZABETH LANG-MIERS
JUSTICE

110246F.P05

-24-



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE MATTER OF THE ESTATE OF
J. B. PILKILTON, DECEASED

No. 05-11-00246-CV

Appeal from the County Court at Law No. 1 of Grayson County, Texas. (Tr.Ct.No. 2009-1-166P).
Opinion delivered by Justice Lang-Miers, Justices O'Neill and FitzGerald participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellees Cynthia Marie Smith and Jeffery Allen Pilkilton recover their costs of this appeal from appellants Catherine C. Pilkilton, Fred Pilkilton, Jr., and Roger Pilkilton.


Judgment entered February 6, 2013.


ELIZABETH LANG-MIERS
JUSTICE