**Steven KAHN, Appellant,**

**v.**

**IMPERIAL AIRPORT, L.P.,**
**Appellee/Cross–**
**Appellant,**

**v.**

**Steven Kahn and Condom Sense,**
**Inc., Cross–Appellees.**

No. 05–08–01022–CV.

Court of Appeals of Texas,
Dallas.

March 16, 2010.

Russell Hubbard, Monica Lynne Luebker, Glast, Phillips & Murray, PC, Dallas, TX, for appellant.

Scott D. Weber, Calloway, Norris, Burdette & Weber, Dallas, TX, for appellee.

Before Justices MOSELEY, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice FITZGERALD.

This appeal involves a commercial lease (the Lease) for a retail store selling adult novelty items under the name "Condom Sense" in Irving, Texas. Imperial Airport, LP (Imperial), the lessor, sued Steven Kahn, Condom Sense, Inc. (CSI), and M. Stack, LLC (M. Stack) for breach of the Lease. CSI and M. Stack counterclaimed, alleging Imperial had breached a pre-Lease agreement between Kahn and Imperial's leasing agent.[1] The trial court's judgment found Kahn liable and awarded Imperial damages for breach of the Lease, attorney's fees, and interest. The judgment ordered that Imperial take nothing on its claims against CSI and M. Stack and that CSI and M. Stack take nothing on their breach-of-Lease counterclaim. Kahn appeals; Imperial cross-appeals. We affirm the trial court's judgment in part and reverse and remand it in part.

## BACKGROUND

Imperial owned the leased premises; Bradford Management Company, Inc. managed the property for Imperial. Bradford employee Michael Brashears negotiated the Lease with Kahn. Kahn signed the Lease in July 2005. The Lease term began October 1, 2005 and extended for sixty-three months. The leased premises was to be occupied by a store under the name "Condom Sense." Kahn operated four stores under the same name in Dallas. During the negotiations, Brashears visited at least one of the Dallas stores. Thus, both parties knew the nature of the store that was to occupy the premises.

At trial two different versions of the Lease were introduced into evidence. Kahn's version was Defendant's Exhibit 1. It includes the following signature block for the lessee; italicized words were handwritten or printed on the Lease signature page by Kahn.

LESSEE:

*Condom Sense*

---

1. Kahn and M. Stack also alleged conversion of inventory and sought a declaration that they were the rightful owners of the inventory. Those claims have been resolved and are not at issue in this appeal.

By: *Steve Kahn It's president*

*STEVE KAHN (President)*
(Type Name and Title)

By: *DBA Condom Sense*

_____
(Type Name and Title)

The page appears to be dated July 2, 2005, although the date is less than clear.[2] The document Kahn objected to was Plaintiff's Exhibit 1; it is dated July 21, 2005. The lessee's signature block on this exhibit is similar, but not identical:

LESSEE:

*Condom Sense*

By: *It's president*

*Steve Kahn*
(Type Name and Title)

By: *STEVEN KAHN*

_____
(Type Name and Title)

Other than the date, the significant difference between the two signature blocks is Kahn's inclusion on his version of the handwritten phrase "DBA Condom Sense."

With Imperial's knowledge, Kahn applied for the store's certificate of occupancy himself. He did not disclose the nature of the business in his application. In December 2005, Kahn oversaw creation of M. Stack, a limited liability corporation that Kahn claims was to be the actual lessee. During this time period, Imperial finished out the premises to Kahn's specifications at a cost of $27,000. Rent was paid for the initial months of the Lease term by an entity named SB TAZ, LLC.

The Irving Condom Sense store opened on February 9, 2006. The next day, the store was raided by the Irving police, who seized some, but not all, of the store's inventory. The City of Irving did not close the store down. However, Kahn, his mother Marcia Kahn, and M. Stack (collectively designated the Applicants by the City) entered into an Agreed Order with the City. The terms of that order required the store to cease sale of "items used in conjunction with sexual activity" and to change its name. In return, the Applicants would avoid prosecution. But despite the order, the store did not re-open, and after April 2006 no more rent payments were made. Imperial locked the lessee out, seized the remaining inventory, and attempted to re-let the premises. Imperial did not find a new tenant until August 2007.

Imperial sued Steven Kahn, CSI, and M. Stack for breach of the Lease. Imperial also made claims for misrepresentation against Kahn. CSI and M. Stack counterclaimed based on the seizure of the inventory. The case was tried to the court, and the trial court issued a lengthy set of findings of fact and conclusions of law. The court's judgment denied Imperial's claims against CSI and M. Stack. It ordered Kahn to pay Imperial the finish-out costs, leasing commissions incurred, attorneys' fees, interest, and costs. Finally, the judgment ordered Imperial to return the seized inventory.[3]

Kahn appeals. Imperial cross-appeals as to certain trial-court rulings involving Kahn and CSI. M. Stack is not a party to this appeal.

## STANDARD OF REVIEW

Findings of fact entered in a case tried to a court are of the same force and digni-

---

**2.** The date is handwritten in blanks:
 this *2—* day of *July,* 2005.
 The superscript following the handwritten "2" appears to read "th."

**3.** Imperial has returned the seized inventory, so inventory-related issues are not included within this appeal.

ty as a jury's verdict on jury questions. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We apply the same standards in reviewing the legal and factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Rich v. Olah,* 274 S.W.3d 878, 883 (Tex.App.-Dallas 2008, no pet.). In a legal sufficiency review, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005). We ask whether the evidence, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not, would permit reasonable and fair-minded people to reach the finding under review. *Id.* at 827. In our factual sufficiency review, we consider all the evidence; we will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *LaCroix v. Simpson,* 148 S.W.3d 731, 734 (Tex.App.-Dallas 2004, no pet.). This Court is not a fact finder and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002).

## BREACH OF LEASE

The parties' issues are rooted in the Lease at the most fundamental level. They disagree concerning the identity of the lessee, whether there was a breach of the Lease, and the appropriate measure of damages for any breach found. We address these issues in turn.

### Identifying the Lessee

The trial court concluded Kahn breached the Lease and is individually liable as the lessee. Kahn's first four issues challenge these findings. Imperial's first cross-issue, on the other hand, argues CSI should be held liable as lessee jointly and severally along with Kahn.

#### *Two Versions of the Lease*

■ In his first issue, Kahn challenges the trial court's ruling admitting into evidence a version of the Lease that varied from the version introduced by Kahn. Kahn argues Imperial's version of the Lease was not properly admitted because it was proved up by an untimely filed business records affidavit. Rule 902(10) of the Texas Rules of Evidence requires business records affidavits to be filed at least fourteen days prior to trial. Imperial's affidavit was filed twelve days before trial. Kahn objected to the exhibit, and the issue was discussed at a pre-trial hearing. Ultimately the trial court granted Imperial leave to file the untimely affidavit.

The rules of civil procedure give a trial court substantial discretion in admitting evidence. And when an act is required to be performed within a specified time, the court generally has discretion to order that period of time enlarged. TEX.R. CIV. P. 5. However, even if the trial court lacked discretion to extend the period of time for filing business records affidavits, there is no reversible error unless admission of the alternative version of the Lease probably

caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). Kahn makes no argument at all concerning any harm purportedly caused by the shortened time period between the filing date and the start of trial. Instead, Kahn's arguments are limited to the potential harm caused by admitting a version of the Lease that does not include any assertion Kahn was signing for a "DBA."[4] The only difference between the two versions of the Lease is the signature page. The trial judge heard the attorneys argument on this issue and heard the parties testify as to when and how the Lease was executed. The court could consider the differences between the documents and the testimony of the parties. The trial court was uniquely well-situated to review the conflicting evidence, to determine how much weight to give to the different documents and testimony, and to draw conclusions based on weight and credibility of the evidence. *See Rich,* 274 S.W.3d at 884 ("In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony."). We conclude the court's admission and examination of the second version of the Lease did not probably cause rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). We overrule Kahn's first issue.

### Kahn's Individual Liability

■ In his third and fourth issues, Kahn challenges the trial court's findings that he entered into the Lease in his individual capacity and should be liable in that capacity. Kahn testified he signed the Lease on July 21, 2005 as Condom Sense's president. He testified he was not president of CSI on that date, but he did not know what entities he *was* president of on that date. Kahn claimed at trial that M. Stack was really the lessee under the Lease, although he acknowledged that "M. Stack" did not appear anywhere in the Lease. He agreed that M. Stack did not exist when the Lease was signed, or when the Certificate of Occupancy was signed, and that he had no authority to sign the Lease for M. Stack. Kahn testified it was his practice to have a DBA Condom Sense enter into a lease on behalf of an entity to be formed after "everything [is] resolved." If the landlord wanted the lease signed before formation, he testified, there would be an addendum to the lease. But Kahn testified no addendum was drafted in this case, and he had never notified anyone at Bradford that M. Stack was to be the lessee for the Irving store.

■ Kahn's arguments have no basis in law. Initially, an individual cannot sign for and bind a DBA entity. A DBA is no more than an assumed or trade name. And it is well-settled that a trade name has no legal existence. *See Davis v. Raney Auto Co.,* 249 S.W. 878, 878 (Tex.Civ. App.-Texarkana 1923, no writ) (trade name "has no actual or legal existence"). Thus, to the extent Kahn purported to sign the Lease on behalf of Condom Sense as a DBA, he bound only himself. Likewise, one cannot sign for and bind a legal entity that does not yet exist. Kahn argues he signed the Lease as a promoter for the later-created M. Stack. But when a promoter signs a contract on behalf of an unformed entity, he is personally liable on the contract unless there is an agreement

---

4. "DBA"—or "d/b/a"—is the abbreviation for "doing business as"; it generally precedes a person's or business's assumed name. BLACK'S LAW DICT. 425 (8th ed. 2004). An assumed name, or a trade name, is the name under which a business operates. *Id.* at 133, 1533. In this opinion we will use the term DBA to mean an assumed or trade name.

with the contracting party that the promoter is not liable. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex.App.-Fort Worth 1997, writ denied). Our record contains no evidence Imperial agreed not to hold Kahn liable. Moreover, the Lease was not made in the name of the unformed entity; there was conflicting testimony concerning whether Brashears knew Kahn was purporting to sign for an unformed entity; and no evidence was presented indicating M. Stack adopted the Lease after its formation. *See id.* We conclude that, under the facts of this case, Kahn is personally liable on the Lease.

■ Imperial argued below that Kahn is liable individually because a specific provision of the Lease, article 14.09, makes a person executing the Lease individually liable if he makes false representations concerning the ability of the corporation to do business or his authority to sign for the corporation.[5] In his second issue, Kahn asserts the trial court erred in finding he made any misrepresentation. But there is ample evidence supporting the trial court's finding. Although Kahn testified that Brashears knew Kahn was signing the Lease for an unformed entity, Brashears denied that he had been told. Based on Kahn's conduct and representations, Brashears believed Kahn signed for CSI. Kahn signed as president of the lessee entity—whatever it was at that time—although he was not president of any entity he could name at trial. Marcia Kahn, the actual president of CSI, testified Kahn did not have authority to sign the Lease on behalf of CSI. We conclude a reasonable fact finder could have concluded Kahn misrepresented his own or the lessee's status. *See City of Keller,* 168 S.W.3d at 822. We further conclude the evidence supporting the misrepresentation finding is not so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain,* 709 S.W.2d at 176. The trial court had sufficient evidence to make its credibility determinations in this case, and we will not substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Clancy,* 705 S.W.2d at 826.[6]

Kahn's signature and his arguments suggest a number of possibilities: Kahn signed the Lease for CSI when he had no authority to do so; Kahn signed for a nonexistent LLC; or Kahn signed for a DBA. In each of those scenarios liability as lessee would fall, if at all, on Kahn personally. We affirm the trial court's conclusion that Kahn was individually liable as lessee in this case. We overrule Kahn's second, third, and fourth issues.

## Ratification

■■ Kahn's eighth issue argues the court erroneously failed to find in his favor on the affirmative defense of ratification. "Ratification is the adoption or confirmation by a person, with knowledge of all

---

5. The provision states in its entirety:

 If Lessee executes this Lease as a corporation, each of the persons executing this Lease on behalf of Lessee does hereby personally represent and warrant that Lessee is a duly authorized and existing corporation, that Lessee is qualified to do business in the state in which the leased premises are located, that the corporation has full right and authority to enter into this Lease, and that each person signing on behalf of the corporation is authorized to do so. In the event any representation or warranty is false, all persons who execute this Lease shall be liable individually, as Lessee.

6. We note that Kahn also argues he should not be individually liable under article 14.09 because the Lease was signed by a DBA and not a corporation. As we have discussed above, signing on behalf of a DBA would also result in individual liability for Kahn.

material facts, of a prior act that did not then legally bind that person and which that person had the right to repudiate." *Avary v. Bank of America, N.A.,* 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied). Kahn argues that even if there were initially grounds for holding him individually liable under the Lease, Imperial confirmed M. Stack as the true lessee. Because ratification is an affirmative defense, Kahn bore the burden of proof. *See id.* at 787–88. Kahn relies upon the Acceptance of Premises, a trial exhibit that he signed on December 12, 2005. Kahn asserts that Imperial received the Acceptance of Premises and made no objection to it, thus ratifying M. Stack as the true lessee.

■ In this instance, the signature block included the typed name of the lessee as "Condom Sense," with a handwritten annotation as to the identity of the lessee. Again, handwritten entries are in italics.

LESSEE

*STACK LLC DBA*

Condom Sense
(Type Name of Lessee)

By *Steven Kahn*
(Signature)

*Steven Kahn Its President*
(Type Name and Title)

*12/12/05*
(Date Signed)

The purported lessee on this document—Stack LLC DBA Condom Sense—was never an entity related to the Kahns in any way. And the entity that Steven Kahn argues ratified the Lease through this document—M. Stack—is not mentioned in the document. (Indeed, the record establishes that M. Stack still did not exist when Kahn signed the Acceptance of Premises.) The names of the entities are similar, but in the

end that similarity only adds to the confusion caused by Kahn's cavalier usage of entities and titles. In dealing with Imperial, Kahn signed documents as president of Condom Sense, president of DBA Condom Sense, and president of Stack LLC. Rent for the Irving store was paid by yet another entity, SBK TAZ, LLC. And Steven Kahn testified that he never informed Imperial that M. Stack, once it was finally formed, was to be the lessee under the Lease. The Lease was never amended to name M. Stack as lessee, nor was the Lease assigned or its obligations in any manner transferred to M. Stack. Ratification requires knowledge of all material facts. *Id.* at 788. We find no evidence Imperial knew of the existence of M. Stack, let alone that Kahn was asserting M. Stack had become Imperial's lessee. The trial court did not err in finding there was no ratification in this case. Kahn's eighth issue is without merit.

### CSI's Liability

■ In its first cross-issue, Imperial argues CSI should be jointly and severally liable as lessee—along with Kahn—based on the legal principle of apparent authority. Apparent authority arises when a principal either: (a) knowingly permits an individual to hold himself out as having authority to act as agent for the principal, or (b) acts with such a lack of ordinary care as to clothe the individual with indicia of authority, leading a reasonably prudent person to believe the agent has authority to bind the principal. *Baptist Mem. Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 948 (Tex.1998). In making a determination of apparent agency, only the conduct of the principal is relevant, and the principal must have full knowledge of all material facts. *Gaines v. Kelly,* 235 S.W.3d 179, 182 (Tex.2007). Thus, our review examines the conduct of the principal and the reasonableness of the third party's as-

sumptions about authority. *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex.App.-Dallas 2008, no pet.). Representations by the purported agent are not evidence of apparent authority; nor are the mere speculations of the third party. *Id.* Indeed, "[w]ithout acts of the purported principal, acts of a purported agent which may mislead persons into false inferences of authority, however reasonable, will not serve as a predicate for apparent authority." *CNOOC Southeast Asia Ltd. v. Paladin Resources (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex.App.-Dallas 2007, pet. denied) (quoting *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex.App.-San Antonio 1998, pet. dismissed w.o.j.)). Finally, Texas law does not presume agency; the party alleging agency has the burden of proving it. *IRA Resources, Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex.2007). Thus, it was Imperial's burden below to prove the elements of apparent agency.

 In this case, Imperial relies exclusively on acts or statements attributed to the putative agent, Kahn, rather than to the putative principal, CSI. Imperial's pleading refers only to statements and conduct by Kahn. Likewise, its briefing in this Court refers only to statements and conduct by Kahn. Our review of the record has identified no contact between Marcia Kahn (CSI's president and apparently its sole representative) and Imperial or Bradford or Brashears. Nor do we find evidence that Marcia Kahn allowed her son to hold himself out as CSI's agent.[7] Marcia Kahn testified she did not know her son had planned to open an Irving store and had negotiated the Lease until he asked her "to file for a corporation." Imperial argues Steven Kahn led it to believe he was acting for CSI. But apparent agency can only be created by the acts of the principal. *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004). Indeed, "[d]eclarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183–84.

Kahn argues we should not even address Imperial's apparent authority argument because it was not pleaded. Imperial responds that the issue was tried by consent. We conclude the facts relied upon by Imperial were pleaded and placed into evidence at trial. However, as a matter of law, those facts do not establish apparent agency. Thus, Imperial's argument fails on the merits. We decide Imperial's first cross-point against it.

### Existence of a Breach

In his fifth issue, Kahn argues the trial court erroneously found he had breached the Lease.

#### *Article 14.09 of the Lease*

The trial court found Kahn breached article 14.09, quoted above, by misrepresenting both the lessee's corporate status and his own authority in signing the Lease. However, assuming the trial court is correct and Kahn did misrepresent his own or the lessee's status, he did not thereby breach the Lease. Article 14.09 is not a covenant Kahn promised to keep. It is a liability-shifting provision, assuring the Lessor that someone will satisfy the obligations of the Lessee. Accordingly, article 14.09 establishes Kahn's liability if some other breach of the Lease is proven, but it

---

7. . Imperial points to a September 8, 2005 letter from Steven Kahn to Bradford and charges the letter was written on CSI letterhead. But the letterhead did not use the corporation's name; it used only the trade name, Condom Sense.

will not on its own support an award of damages against Kahn.

### Nonpayment of Rent

■ The trial court also found that: Despite Imperial's full performance of all obligations and conditions of the Lease, beginning in the month of April, 2006, Kahn, despite demand, failed and refused to pay rentals and other charges due under the terms of the Lease, or to otherwise cure the breach of the Lease.

Kahn does not deny he failed to make payments due under the Lease beginning in April 2006. However, he argues his failure to comply with Lease obligations should be excused because the Lease was terminated by the City's actions, which he characterizes as a taking of the leased premises. The trial court's findings support Kahn on this issue. The court found "a substantial part of the Leased Premises was taken by the City of Irving for quasi-public use under a governmental law, ordinance or regulation" and that this taking materially interfered with the intended use of the leased premises. Accordingly, according to the trial court, no rent or other obligations of the lessee were owed after the date of the raid. In its second cross-point, Imperial challenges the trial court's finding that the Lease terminated and Kahn was, as a result, discharged from his obligations as lessee. We agree with Imperial on this issue.

■ A taking may be either physical or regulatory. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998). A physical taking occurs when the government authorizes an unwarranted physical occupation or appropriation of an individual's property. *See id.; City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex.App.-Dallas 2006, no pet.). The trial court did not find, and Kahn does not contend, the City physically appropriated

the leased premises for some governmental purpose. Instead, the trial court found Kahn's leasehold was taken by the City "under a governmental law, ordinance or regulation." A compensable regulatory taking occurs if governmental regulations deprive a property owner of all economically viable use of his property or if those regulations totally destroy the property's value. *City of Dallas v. VRC LLC*, 260 S.W.3d 60, 65 (Tex.App.-Dallas 2008, no pet.). Kahn has not argued that the City's sexually oriented business ordinance destroyed the value of the leased premises or the ability to use the premises for any economically viable purpose. However, we will recognize a regulatory taking if the governmental restrictions unreasonably interfered with Kahn's rights to use his property. *See id.* We determine whether there has been unreasonable interference by considering (1) the economic impact of the regulation, and (2) the extent to which the regulation interferes with the owner's distinct investment-backed expectations. *Id.* (citing *Mayhew*, 964 S.W.2d at 935).

■ Kahn argues the Irving Condom Sense store could not be operated for its intended use under the terms of the Agreed Order and under the City's interpretation of its ordinance. However neither of these restrictions on the use of the leased premises qualifies as a governmental taking. The Agreed Order represents the joint decision of the Applicants—including Kahn—and the City; it was not a unilateral act or regulation by the City. Kahn could have chosen to litigate the City's interpretation of the ordinance. Indeed, he testified at trial that at least one court had held Condom Sense was not a sexually oriented business under an identical ordinance. But Kahn voluntarily agreed not to litigate and to accept the restrictions in the Agreed Order. And as to the restrictions posed by the ordinance

itself, it is uncontroverted that the Irving ordinance pre-dated Kahn's negotiation of the Lease and that Kahn himself was familiar with the ordinance. When existing law regulates the use of property, an owner's reasonable expectations must take those regulations into account. *See City of Dallas v. VRC*, 260 S.W.3d at 66. Kahn did not prove he had a reasonable expectation of operating the store he intended at the leased premises. Accordingly, we conclude he did not prove a regulatory taking in this case. *See id.*

No provision of the Lease provides for termination of the Lease under these circumstances. Article 8.01 involves termination when all or a substantial part of the leased premises are taken by governmental action. We have concluded no such taking occurred. In article 3.03, the lessee promises to comply with all laws, ordinances, orders, rules, and regulations of governmental entities. Again, the undisputed facts establish the City's sexually oriented business ordinance pre-dated the Lease and Kahn was familiar with its terms. Nevertheless, he promised, as lessee, to comply with it. The Lease certainly does not provide that his obligations are excused if he breaks that promise.

We conclude the Lease was not terminated by any action or regulation of the City or by operation of the Lease itself. Accordingly, when Kahn failed to pay rent and otherwise comply with his obligations as lessee, his breach was not excused. Kahn's fifth issue is overruled, and Imperial's second cross-point is sustained.

### Damages Under the Lease

In his sixth issue, Kahn argues the trial court should not have awarded Imperial contract damages and attorney's fees when the court found the Lease had been terminated. Because we have concluded the Lease was not terminated, we overrule this issue.

■ In Kahn's seventh issue, Kahn challenges the trial court's damages award itself. The trial court awarded Imperial $45,000 in damages, representing the sum of $27,000 Imperial spent to finish out the leased premises at Kahn's request and $18,000 Imperial spent for commissions in connection with the Lease. Kahn argues these amounts are not the natural, probable, and foreseeable consequences of his breach. We agree. Kahn's breach was the failure to pay rent and otherwise comply with his obligations as lessee from April 2006 through August 2007. Amounts spent for initial finish out or commissions are not relevant to this breach, and the Lease does not otherwise make them recoverable. We sustain Kahn's seventh issue to the extent it complains of the $45,000 award for contract damages.

### Conclusion

We affirm the trial court's judgment in all respects except insofar as it awards Imperial damages in the amount of $45,000 for Kahn's breach of the Lease. We reverse that damages award, and the related pre-judgment and post-judgment interest awards, and we remand the case for further proceedings on damages consistent with this opinion.