**Reversed and Remand and Opinion Filed May 25, 2022**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-19-01412-CV**
_____

**HALL CA-NV, LLC, Appellant**
**V.**
**ROBERT RADOVAN AND WILLIAM CRISWELL, Appellees**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-02395**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Smith[1]
Opinion by Justice Molberg

Hall CA-NV, LLC (Hall) appeals the trial court's final judgment ordering that

it take nothing on its claim that appellees, Robert Radovan and William Criswell,

breached their loan guaranty agreements. Hall raises six issues on appeal: whether

(1) Hall proved all elements in its claim for recovery on the guaranty agreements;

(2) Hall conclusively established damages; (3) the guaranty agreements waived any

defenses raised by appellees; (4) appellees otherwise failed to plead or prove those

_____

[1] The Honorable John Browning participated in the case submission but not in the issuance of this
opinion, which occurred after the expiration of his term on December 31, 2020; the Honorable Craig Smith
succeeded him and has reviewed the briefs and record before the Court. *See* TEX. R. APP. P. 41.1.

defenses; (5) the trial court's findings of fact should be set aside because Hall proved liability and damages and appellees waived or failed to prove any defenses; and (6) the trial court abused its discretion by admitting into evidence a bankruptcy order. We conclude legally sufficient evidence supported Hall's claim, and Radovan and Criswell waived any defenses to liability and otherwise failed to prove any applicable defense. We set aside the trial court's findings to the contrary. Accordingly, we reverse the trial court's judgment and render judgment for Hall.

## I. BACKGROUND

### a. Loan and guaranty agreements

Hall CA-NV, LLC agreed to loan New Cal-Neva Lodge, LLC up to $29 million for a hotel renovation project. The hotel being renovated was the collateral that secured the loan. As additional security for the loan, Hall would receive "100% of the membership interests in" the nearby Fairwinds Estate. Their loan agreement provided that the "maximum aggregate amount of the Loan shall not exceed the lesser of (i) 60% of the Lender approved acquisition and renovation costs, (ii) 60% of the appraised value of the Project, on an 'as completed' basis, or (iii) $29,000,000.00." The loan was to be paid in installments. Interest on the loan, at "rates specified in the Note," was computed on the unpaid principal balance and was "due and payable as set forth in" a promissory note the parties executed. New Cal-Neva agreed to pay "all expenses of the Loan," including a Commitment Fee and Hall's attorney's fees "incurred in connection" with the loan. According to the

promissory note, an additional five percent in interest would accrue on the balance in the event of default.

The loan agreement specified that Hall could "perform any of such covenants, agreements and obligations, and any amounts expended by [Hall] in so doing shall constitute additional indebtedness" if New Cal-Neva failed to perform any of its covenants, agreements, or obligations under the agreement and other loan documents. New Cal-Neva also covenanted and agreed Hall would be allowed to settle mechanic's lien claims that New Cal-Neva failed to discharge.

Radovan and Criswell, the principals of New Cal-Neva, executed and signed separate but identical guaranty agreements guaranteeing the loan. In section two of their respective agreements, Radovan and Criswell "unconditionally and irrevocably guarantee[d] to [Hall] the punctual payment when due, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter, of the Guaranteed Indebtedness." The guaranties were continuing guaranties of payment and not guaranties of collection. Radovan and Criswell each agreed "that if all or any part of the Guaranteed Indebtedness shall not be punctually paid when due . . . Guarantor shall, immediately, upon demand by Lender, pay the amount due" on the indebtedness. The guaranty agreements specified that Radovan and Criswell were "jointly and severally liable for the payment and performance" of the guaranteed obligations.

Radovan and Criswell, in section nine of the agreements, agreed that their obligations under the agreements

> shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor: (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any partial release of the liability of Borrower or any Pledger, or Guarantor hereunder, or the full or partial release of any other guarantor or obligor from liability for any or an of the Guaranteed Obligations; (c) any disability of Borrower, or the dissolution, insolvency, or bankruptcy of Borrower, or any other guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; . . . (i) the settlement or compromise of any of the Guaranteed Obligations; . . . or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, Borrower or Guarantor.

The two guarantors also waived their right to require Hall to sue or exhaust its remedies against New Cal-Neva and other guarantors and obligors. They waived "any principles or provisions of law, statutory, or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's Obligations hereunder . . . ." These were waived whether they arose under "common law, in equity, under contract, by statute, or otherwise . . . ." Radovan and Criswell further agreed Hall could "exercise any and all rights granted to it under the Loan Agreement, and the other Loan Documents without affecting the validity or enforceability of this Guaranty."

–4–

## b. *Bankruptcy and litigation*

Following foundation problems with the construction and the loss of certain investors, New Cal-Neva defaulted on the Hall loan and filed for bankruptcy. A buyer was found, and the hotel and related assets were sold for about $38.15 million. The buyer also wanted to purchase the Fairwinds Estate, which was not part of the bankruptcy estate. The bankruptcy court included a "limited exculpation" in its order, which provided as follows:

> For the avoidance of doubt, and in furtherance of Fed. R. Bankr. P. 6004(f)(2) and other applicable law, the Court hereby confirms and orders that there shall be no personal liability for any individual who executes any documents, including the revised Plan Documents, that the Buyer reasonably deems necessary to effectuate the transfer of the Purchased Assets, including without limitation the Fairwinds Estate, to the Buyer, and any such individual is exculpated from any personal liability that might otherwise arise on account of the execution of such Plan Documents.

The general contractor, Penta Building Group, claimed to have a priority mechanic's lien over the hotel property. As part of the bankruptcy settlement, a "lien litigation reserve" of $15 million was carved out of the sale proceeds for Hall and Penta to resolve Penta's claim. Hall and Penta ultimately agreed Penta would receive $8,025,000 from the reserve. In total, Hall received about $27.5 million plus furniture, fixtures, and equipment, which was about $700,000. Hall also received $171,000 from Old Republic to reimburse it for attorney's fees. Hall extended additional funds in connection with the bankruptcy, totaling about $2 million. Hall also incurred attorney's fees from the bankruptcy proceeding.

Through counsel, Hall demanded Radovan and Criswell pay the full amount of the guaranteed indebtedness pursuant to their guaranty agreements. Hall sued Radovan and Criswell to recover the guaranteed indebtedness under their agreements. They answered, making general and specific denials, and asserting several affirmative defenses, including waiver, estoppel, accord and satisfaction, the one satisfaction rule, failure to mitigate, impaired collateral, res judicata, and collateral estoppel. In appellees' rule 166 disclosure, they noted the question of a material alteration of the underlying contracts as a "contested issue of fact." In their "identification of legal matters to be ruled on or decided by the court," they noted (i) the scope of the bankruptcy court's exculpation order, (ii) whether Hall may enforce the guaranty agreements, (iii) "[w]hether [their] affirmative defenses preclude enforcement of the guaranty agreements."

At the bench trial, Michael Jaynes, president of Hall, testified that Hall had not sold or transferred its interest in the loan at issue. He said Hall received about $27.5 million plus furniture, fixtures, and equipment from the New Cal-Neva bankruptcy estate. Hall received about $170,000 from its insurer, which it was seeking to recover from Radovan and Criswell. Other than that, Hall had not received anything from any other source. Jaynes said Hall did not pay Penta any amount of money; instead, Penta was paid through the bankruptcy court, like Hall was. Finally, Jaynes testified Hall had never agreed to release Radovan or Criswell from their guaranty obligations.

On cross-examination, Jaynes said the maximum amount Hall could advance under the loan documents was $29 million, though it only ever disbursed just under $20 million. He said Hall believed when it closed the loan that it would have a first-priority lien. Eventually, during the bankruptcy, Hall decided there was "significant risk as it related to the priority lien position to us." Jaynes said it was never determined whether Hall lost its "priority lien at any time." He said Penta signed a document saying that it had not begun construction at the time of the loan agreement. But he testified there was risk with litigating Penta's claims.

Ronda Tyrrell was responsible for selling the furniture, fixtures, and equipment Hall received from the bankruptcy estate. She testified Hall retained $194,021.62 worth of furniture, fixtures, and equipment, for which she said Hall had not paid because they "haven't used them." Tyrrell said the total value of furniture, fixtures, and equipment sold by Hall was $2,290,767.29. Radovan and Criswell also stipulated Hall received about $545,000 for some of these assets and it retained others valued at about $194,000 for a total of over $720,000.

David Epperson, Hall's portfolio manager for the New Cal-Neva loan, testified that, as of July 30, 2019, Hall was owed about $8.6 million on the loan. According to the amortization schedule, this was the sum of the loan balance, which was $7,439,342.70, the interest accrued, which was $639,570.83, and the default interest, which was $531,365.49. The total was $8,610,279,02. Epperson said neither the $194,000 worth of retained furniture, fixtures, and equipment nor the

–7–

attorney's fees received by Hall from the title company were reflected as credits on the amortization schedule. Radovan and Criswell stipulated they had "not paid any amounts under their guaranty agreements."

Radovan testified he and Criswell, through New Cal-Neva and with investors, bought the Cal-Neva Lodge property in 2013. They also bought the neighboring Fairwinds Estate. Radovan said he believed Penta had executed releases related to any work Penta did prior to the Hall loan. Radovan testified he pledged the Fairwinds Estate as additional collateral for the loan. "Given the amount of equity in the property," he said, "we never thought that we'd really be at risk on the personal guarantees up to 20 million." He said he would not have agreed to guarantee the loan without Penta's representations, Hall's title insurance, and the collateral that they had. He acknowledged the guaranty agreements did not reflect that understanding, nor did he tell Hall that those safeguards were the only reason he agreed to guarantee the loan.

Radovan said he thought the $32 million indebtedness was greater than the amount he had agreed to guarantee. He testified he was shocked when Hall decided to settle with Penta, though he admitted on cross-examination he did not know whether Penta's position was correct under the law. Radovan did not want to sell the Fairwinds Estate, which he said he had previously pledged to Hall, but that "at that point, we were doing what the attorneys and the Court was asking us to do." On cross-examination, Radovan acknowledged Capital One had a first lien on the

–8–

Fairwinds Estate, and what Hall had was a pledge of membership interest. Radovan said Hall's attorney said Hall would come after his and Criswell's guaranty agreements if they sold the Fairwinds Estate. He said he would have resigned, but he obtained an "exculpation" of personal liability relating to the transfer of the Estate from the bankruptcy court.

Criswell testified he delegated authority to Radovan regarding "practically every aspect of the Cal-Neva project." Like Radovan, he said he did not think he was liable under his guaranty agreement because he thought Hall had been "fully paid." If there was any deficiency, he said, it was because Hall decided to give away some of the bankruptcy sale proceeds to Penta.

*c. Findings of fact and conclusions of law*

The trial court ruled for Radovan and Criswell, ordering that Hall take nothing. The court entered findings of fact and conclusions of law. The court found that (1) Hall loaned about $19.5 million to New Cal-Neva; (2) the maximum aggregate amount of the loan Radovan and Criswell guaranteed was "never to exceed $29 million"; (3) Radovan and Criswell's guaranties were based on "three key safeguards": Hall was the first priority lien holder to New Cal-Neva Lodge, Hall had a security interest in the hotel property and the neighboring Fairwinds Estate, and Hall had title insurance; (4) Penta represented to Hall it had not commenced any work prior to the loan; (5) Penta executed a subordination agreement in favor of Hall; (6) Radovan and Criswell believed Penta had not begun any work under its

contract with Hall; (7) New Cal-Neva defaulted on its obligations and filed for bankruptcy in 2016; (8) Penta began an adversary proceeding claiming to have lien priority, alleging it began work before Hall's loan was made; (9) Hall represented, during the bankruptcy proceedings, that it was the first priority lien holder, ahead of Penta; (10) Hall settled the Penta adversary proceeding by agreeing to pay Penta over $8 million despite representing that it was the first priority lien holder; (11) Radovan and Criswell were not told about the agreement before it was agreed to; (12) Hall received value for its payment to Penta; (13) the bankruptcy plan involved selling the hotel property; (14) the purchaser wanted to buy the Fairwinds Estate, which was not part of the bankruptcy estate, in addition to the hotel; (15) because the transfer of the Fairwinds Estate would expose them to liability under their guaranty agreements, Radovan and Criswell obtained an exculpation from the bankruptcy court before transferring that estate to the purchaser; (16) Radovan and Criswell executed "plan documents" to transfer the Fairwinds Estate to the buyer; (17) the secured properties sold for over $38 million; (18) that amount was more than sufficient to cover the entire amount owed Hall, but Hall elected to enter an agreement with Penta, giving it over $8 million; (19) after paying Penta, Hall collected at least $27 million from the bankruptcy proceeding after loaning around $19.5 million, creating the alleged shortfall that is the subject of this suit; (20) Hall also received valuable furniture, fixtures, and equipment, which it partly sold and partly kept; (21) Hall's alleged deficiency was based on a claimed aggregate loan

amount of over $32 million in January 2018; (22) Hall has no damages from the alleged breach; (23) Hall's claims in this case are contrary to positions taken in the bankruptcy proceeding; and (24) Hall's claims are based on a loan balance of more than $32 million; (25) Hall is simultaneously pursuing claims against third parties, including its title insurer, Old Republic, to recover the same loss.

The trial court concluded that (1) Hall cannot obtain a double recovery for the same injury; (2) Hall's decision to settle with Penta, based on claims of seniority for work performed before Hall made its loan, materially altered the parties' agreements under the loan documents; (3) the parties agreed to the loan documents based on the mistaken belief Penta had not begun any work on the hotel that could entitle it to a priority lien with seniority over Hall; (4) Hall is estopped from taking a position contrary to one it took in the bankruptcy proceeding; (5) Hall elected its remedy in the bankruptcy proceeding or otherwise waived its right to enforce the guaranty agreements; (6) Radovan and Criswell were exculpated from liability by the bankruptcy court and thus cannot be held liable for the indebtedness Hall alleges because the indebtedness arises, at least in part, from the lost collateral of the Fairwinds Estate; (7) Hall is not entitled to enforce the guaranty agreements; (8) Hall failed to prove any cognizable damages; (9) Hall failed to mitigate its damages; (10) Hall failed to prove Radovan and Criswell caused the damages alleged; and (11) Radovan and Criswell's obligation was discharged by accord and satisfaction. This appeal followed.

–11–

## II.  ANALYSIS

### a. Standard of review

A party challenging the legal sufficiency of an adverse finding on an issue on which that party had the burden of proof at trial must demonstrate on appeal that the evidence conclusively established, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). First, the challenging party must show that no evidence supported the trial court's finding; and then, if there was none, that the evidence conclusively established the finding urged by the party. *See PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015). "[T]he entire record must be examined to see if the contrary proposition is established as a matter of law." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

When a party challenges the legal sufficiency of an adverse finding on an issue on which an opposing party had the burden of proof, the challenger must demonstrate on appeal that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). A no-evidence challenge will be sustained when the record confirms: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes

–12–

the opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014). The evidence must be reviewed in the light most favorable to the verdict. *Id.*

In a case tried before the court without a jury, in which there are findings of fact and conclusions of law, the reviewing court will indulge every reasonable presumption in favor of the findings and judgment of the trial court, and no presumption will be indulged against the validity of the judgment. *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 252 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). "Findings of fact entered in a case tried to a court are of the same force and dignity as a jury's verdict on jury questions." *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 436–37 (Tex. App.—Dallas 2010, no pet.).

### b. Applicable law

A guaranty creates a secondary obligation according to which the guarantor promises to answer for the debt of another and may be called upon to perform once the primary obligor has failed to. *Anderton v. Cawley*, 378 S.W.3d 38, 46 (Tex. App.—Dallas 2012, no pet.). A guaranty does not entitle a creditor to a double recovery; "it merely provides an alternative source for recovery if the primary obligor becomes insolvent." *Sunbelt Sav., FSB v. Barr*, 824 S.W.2d 600, 603 (Tex. App.—Dallas 1991), *rev'd on other grounds*, 837 S.W.2d 627 (Tex. 1992). The elements of a breach of guaranty claim are: (1) the existence and ownership of the guaranty contract; (2) the terms of the note underlying the guaranty or the performance of the underlying contract by the holder; (3) the occurrence of the

–13–

conditions upon which liability is based; and (4) the guarantor's failure or refusal to perform the guaranty's promise. *Marshall v. Ford Motor Co.*, 878 S.W.2d 629, 631 (Tex. App.—Dallas 1994, no pet.); *Rivero v. Blue Keel Funding, L.L.C.*, 127 S.W.3d 421, 424 (Tex. App.—Dallas 2004, no pet.).

We construe guaranty agreements as any other contract. *See Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983). The construction of an unambiguous contract is a question of law for the court. *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). To ascertain the entire agreement between the parties, separate documents executed simultaneously in the course of the same transaction for the same purpose are to be construed together. *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984).

*c. Discussion*

Hall argues it conclusively proved each element to recover on the guaranty agreements. We agree. First, the guaranties exist and are owned by Hall. Under the two guaranty agreements admitted at trial, Radovan and Criswell guaranteed payment to Hall. *See Schubiger v. First Newport Realty Inv'rs*, 601 S.W.2d 218, 222 (Tex. App.—Dallas 1980, writ ref'd n.r.e.) ("the party offering the note is presumed to be the owner, especially if it is listed as payee, unless the contrary is shown"). Second, it is undisputed that Hall loaned money to New Cal-Neva under the terms of the underlying agreement. This was Hall's only obligation under the loan agreement. Third, New Cal-Neva defaulted on the loan and Hall eventually

–14–

demanded payment from Radovan and Criswell of the guaranteed indebtedness. Fourth, Radovan and Criswell then failed to pay under their guaranty agreements, as they stipulated at trial. Furthermore, Hall established that the amount owed under the guaranties was $8,610,279.02. This number was proved through the testimony of Epperson and the account statement exhibit. *See Diaz v. Multi Serv. Tech. Sols. Corp.*, No. 05-17-00462-CV, 2018 WL 6521916, at *8 (Tex. App.—Dallas Dec. 12, 2018, no pet.) (mem. op.) (concluding that a debt amount was established through the testimony of a company's director of credit and risk management as well as an account statement).

Accordingly, we conclude no evidence supported the trial court's findings that Hall failed to prove Radovan and Criswell's liability, and moreover, the evidence conclusively established Radovan and Criswell's liability under their guaranty agreements. We set aside the trial court's findings of fact and conclusions of law to the contrary.

### 1. Loan amount

In deciding otherwise, the trial court found that Radovan and Criswell never guaranteed any amount over $29 million. Radovan and Criswell, in their argument supporting this finding, point to the loan agreement provision that the "maximum aggregate amount of the Loan shall not exceed the lesser of (i) 60% of the Lender approved acquisition and renovation costs, (ii) 60% of the appraised value of the Project, on an 'as completed' basis, or (iii) $29,000,000.00." Hall points to other

–15–

provisions in the agreement and the note in its argument that the $29 million figure was only a limit on principal advances it could make to New Cal-Neva. For the reasons that follow, we agree with Hall.

One of the recitals at the beginning of the loan agreement made clear that the $29 million limit related to "credit" for New Cal-Neva. It provided that "Borrower has requested Lender *to extend credit* to Borrower in the aggregate amount of up to $29,000,000 (the "Loan") . . . ." (emphasis added). *See Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 279 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) ("The $1000 limit was a limit on *credit* to be extended Clarco, Inc., and clearly was not intended to limit the guarantor's *liability*.").

The definitions section of the agreement noted that the meaning of "loan" was "[a]s defined in [the recital]." Thus, "loan" was defined as "credit to [New Cal-Neva] in the aggregate amount of up to [$29 million]." This meaning of loan was confirmed by its use elsewhere in the agreement. For example, in the representations and warranties section of the agreement, New Cal-Neva represented that "[n]o part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any 'margin stock' . . . ." So restricting the use of anything other than a proceed disbursed to New Cal-Neva would not make sense. *See MCI Telecommunications Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999) ("When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless.").

In the promissory note, New Cal-Neva promised to pay Hall "the principal sum of TWENTY NINE MILLION [] DOLLARS . . . or so much thereof as may be advanced by Lender [ ], together with interest thereon at the Note Rate [ ], and otherwise in strict accordance with the terms and provisions hereof." In other words, the note made a distinction between "the principal sum"—$29 million or some other amount—and "interest thereon at the Note Rate." Both were to be paid to Hall. In the remedies section of the note, New Cal-Neva agreed that, in the event of default, Hall could demand payment on "the entire unpaid balance of the indebtedness evidenced by this Note," including the outstanding principal balance, "all sums advanced or accrued hereunder or under any other Loan Document," and all accrued but unpaid interest.

Under their guaranty agreements, Radovan and Criswell did not merely guarantee the "loan" but all of the indebtedness under the loan documents. Each guaranteed to Hall "the punctual payment when due . . . of the Guaranteed Indebtedness," which was defined as "[a]ll of the indebtedness of Borrower under the Note, the Loan Agreement, the other Loan Documents . . . ."

### 2. *Credibility*

Radovan and Criswell argue the trial court made credibility determinations to which we must defer. They argue that Hall's evidence about the amount owed "varied by over $1.5 million." Michael Jaynes, Hall's president, testified on cross-examination that as of November 28, 2017, the loan balance was $24,730,742.50,

the accrued interest was $4,628,151.04, and the default interest was $2,346,677.88. Counsel for Radovan and Criswell then cross-examined him using an affidavit he submitted during the bankruptcy proceeding. According to the affidavit, on the same date, the principal balance was $23,067,058.03, the contract interest was $4,545,526.92, and the default interest was $2,304,654.21. Jaynes conceded these amounts were different from those in the account statement admitted at trial, but he said that there were "post-protective advances, there's other advances that are outlined on that affidavit." He also testified on re-direct that the affidavit noted, "Amounts outlined above may not include expenses incurred but not yet processed by [Hall]." And Hall, Jaynes further testified, incurred expenses—roughly $2 million—during the bankruptcy proceeding. Jaynes's bankruptcy affidavit was not admitted in evidence, nor was any further evidence offered to explain the discrepancy in the November 28, 2017 numbers.

We first note that none of the trial court's findings and conclusions appear to be based on this discrepancy. Second, the fact finder's credibility determinations must be reasonable. *Bentley v. Bunton*, 94 S.W.3d 561, 599 (Tex. 2002). It "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). The existence of an affidavit, which acknowledged not-yet-processed expenses, does not create a credibility problem that calls in to question Hall's direct evidence about the amount

owed, which "could have been readily controverted." *Cf. Chahadeh v. Jacinto Med. Group, P.A.*, 519 S.W.3d 242, 250 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (discrepancy between a bankruptcy claim and a guaranty claim did not create a fact issue when there was an uncontroverted reason for the difference).

### 3. One-satisfaction rule

The trial court concluded that Hall "cannot obtain a double recovery for the same injury." A "double recovery" exists when a plaintiff obtains more than one recovery for the same injury. *Waite Hill Services, Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). Such a recovery is prohibited by the one-satisfaction rule, under which "a claimant is entitled to only one recovery for any damages suffered." *Nat'l City Bank of Indiana v. Ortiz*, 401 S.W.3d 867, 887 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *see also Mundheim v. Lepp*, No. 05-19-01490-CV, 2021 WL 1921122, at *8 (Tex. App.—Dallas May 13, 2021, pet. denied) (mem. op.) ("The prohibition against double recovery is a corollary of the rule that a party is entitled to but one satisfaction for the injuries sustained by him.").

Here, there is no evidence Hall recovered anything from Radovan and Criswell under their guaranty agreements. As discussed above, Hall proved it obtained about $27 million from the bankruptcy, which was less than the roughly $32 million balance at the time.

### 4. Affirmative defenses

The trial court also concluded Radovan and Criswell proved numerous defenses, including material alteration, mistake, estoppel, waiver, accord and satisfaction, and failure to mitigate. Hall argues Radovan and Criswell waived all possible defenses in their guaranty agreements. Again, we must agree with Hall.

The two guarantors agreed in section nine that their "obligations under this Guaranty shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event, including, without limitation . . . any other circumstance which might otherwise constitute a defense available to, or discharge of, Borrower or Guarantor." And under section ten, they waived "for the benefit of Lender," among other things, "any principles or provisions of law, statutory, or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's Obligations hereunder . . . . ."

We conclude this broad language in the guaranty agreements waived the affirmative defenses raised by Radovan and Criswell. "To be effective, a waiver must be clear and specific." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 6 (Tex. 2014). Simply because a waiver is "all encompassing does not mean that it is unclear or vague." *Id*. at 8. Indeed, a waiver of "all possible defenses seems to very clearly indicate what defenses are included: all of them." *Id*. For example, in

*Holmes v. Graham Mortgage Corp.*, 449 S.W.3d 257, 259-60 (Tex. App.—Dallas 2014, pet. denied), the guaranty agreement at issue specified that,

> [u]ntil the Guaranteed Obligations are fully performed, Guarantor shall not be released . . . by reason of the illegality or unenforceability of all or any part of the indebtedness represented by the Note as against Borrower or Guarantor based on usury or other legal defenses, statutory or otherwise, and Guarantor hereby to the maximum extent permitted by applicable law expressly waives and surrenders any defense to liability hereunder based upon the foregoing acts, things, agreements or waivers, or any of them.

The guarantor raised numerous affirmative defenses, including judicial estoppel, payment, accord and satisfaction, unjust enrichment, cancellation of debt, illegality, equitable estoppel, and promissory estoppel. *Id.* at 265. "Based upon this plain language of the Guaranty," this Court concluded the guarantor "waived all of these defenses." *Id.*

Radovan and Criswell agreed their obligations would not be diminished by the occurrence of any event or any circumstance that might constitute a defense. They waived any principles of law, statutory or otherwise, that might be in conflict with the terms of their agreements. We conclude this language in the guaranties was clear and specific enough to waive the affirmative defenses raised.

Radovan and Criswell argue we must "harmonize the contract as a whole," ignoring that we must also give effect to every provision. *See MCI Telecommunications Corp.*, 995 S.W.2d at 652. The effect of these provisions was the waiver of the above-listed affirmative defenses to liability under the guaranty

–21–

agreements. *See In re A.B.*, 458 S.W.3d 207, 210 (Tex. App.—Dallas 2015, pet. denied) ("'[m]utual mistake' is an affirmative defense"); *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 277 (Tex. App.—Dallas 2006, no pet.) (noting that failure to mitigate is an affirmative defense); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("material alteration is an affirmative defense"); *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.) ("[q]uasi-estoppel is an affirmative defense"); TEX. R. CIV. P. 94 ("accord and satisfaction" and "waiver" are affirmative defenses).

### 5. *Material alteration*

Radovan and Criswell argue that even if some defenses were waived, material alteration was not because, if it applies, then the guarantors are no longer bound by the guaranties, including the waivers. The trial court found Hall's decision to settle with Penta materially altered its agreement with Radovan and Criswell. Hall responds that material alteration was neither pleaded by Radovan and Criswell nor agued by them at trial, and that moreover, it was not proved. Setting aside the questions of whether this defense was properly before the trial court or waived in the guaranty agreements, we conclude that Radovan and Criswell did not carry their burden to prove it at trial.

A material alteration is an alteration of the underlying contract between a creditor and principal debtor that either injures or enhances the risk of injury to the guarantor. *Futerfas Family Partners v. Griffin*, 374 S.W.3d 473, 478 (Tex. App.—

–22–

Dallas 2012, no pet.). "Because a material alteration is an affirmative defense, the burden is on the surety to demonstrate that a material alteration occurred." *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.). A guarantor may rely upon the terms and conditions of the guaranty being strictly followed, and if the creditor and principal debtor vary in any material degree from the terms of their contract, then a new contract has been formed and the guarantor is not bound to it. *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex. 1991).

Radovan and Criswell fail to identify any terms of the underlying contract that were altered by the parties when Hall settled with Penta during the bankruptcy. On the contrary, the loan agreement allowed Hall to "procure the release and discharge of" mechanics' lien claims if New-Cal Neva failed to do so. Furthermore, the agreement specified that in "settling, compromising or discharging any claims for lien, [Hall] shall not be required to inquire into the validity or amount of any such claim." Thus, Hall not only did not "vary in any material degree from the terms of their contract" when it settled with Penta, it acted within the agreement's terms, which did not require Hall to "inquire into the validity" of Penta's claim. *Cf. Mann v. NCNB Tex. Nat. Bank*, 854 S.W.2d 664, 667 (Tex. App.—Dallas 1992, no writ) ("Any alterations of the underlying loan were made in accordance with the terms of the continuing guaranty."). No evidence supported Radovan and Criswell's defense

of material alteration; we set aside the trial court's findings and conclusions to the contrary.

### 6. *Bankruptcy discharge*

The trial court also found that Radovan and Criswell were exculpated from liability by the bankruptcy court and therefore cannot be held liable for the indebtedness under their guaranty agreements.[2] A discharge in bankruptcy does not affect the liability of a guarantor. *See, e.g.*, *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 324 (Tex. App.—El Paso 1995, writ denied); *Chahadeh v. Jacinto Med. Group, P.A.*, 519 S.W.3d 242, 248 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Under the terms of the guaranty agreements, Chahadeh may be held independently liable for the amount of the outstanding debts under the promissory notes without regard to the outcome of the bankruptcy proceeding."). Radovan and Criswell acknowledge this rule but argue that the bankruptcy court's order specifically extinguished their liability under the guaranty agreements. And, indeed, such a discharge is possible. *See Geary v. Tex. Commerce Bank*, 967 S.W.2d 836, 838 (Tex. 1998) (rejecting "argument that a bankruptcy reorganization plan cannot discharge the debts of someone other than the bankrupt party to someone other than the bankrupt party"). Hall responds, among other ways, that the bankruptcy court's

---

[2] We will assume for the sake of argument that this defense was not waived. *But see* TEX. R. CIV. P. 94 ("discharge in bankruptcy" is an affirmative defense).

"limited exculpation" did not release Radovan and Criswell from their liability under the guaranty agreements.

As described above, the bankruptcy court ordered "that there shall be no personal liability for any individual who executes any documents . . . necessary to effectuate the transfer of the Purchased Assets . . . to the Buyer, and any such individual is exculpated from any personal liability that might otherwise arise on account of the execution of such Plan Documents." In other words, anyone who executed documents transferring the hotel and the Fairwinds Estate to the buyer was shielded from any liability arising from the execution of those documents.

Radovan and Criswell do not explain in their briefing how their liability under the guaranties arose from the execution of plan documents in the bankruptcy court. Of course, their liability under the guaranty agreements arose under the guaranty agreements and the other loan documents. While the transfer of the Fairwinds Estate to the buyer perhaps motivated Hall to pursue Radovan and Criswell on their guaranties, as they indicated at trial, their liability under the guaranty agreements cannot be said to have arisen on account of the transfer. The language in the bankruptcy order makes this case unlike, for example, the release involved in *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1047 (5th Cir. 1987) (emphasis added), where "the bankruptcy court confirmed a reorganization plan [ ] that *released a guaranty* executed by the appellant, Dr. Joseph Shoaf, in favor of the creditor, now plaintiff-appellee, Republic Supply Company[.]"

–25–

Moreover, no "plan documents" were admitted at trial. Thus, there was no evidence before the trial court about what liability was extinguished by the bankruptcy court because the plan documents remained an unknown. Under questioning from Hall, Radovan first said in a circular way that the plan documents "were a group of documents that made up the plan documents," but later admitted he did not know how "plan documents" was defined in the bankruptcy court's order. We conclude that Radovan and Criswell failed to present any evidence their guaranty agreements were released by the bankruptcy court.

### 7. Retained furniture, fixtures, and equipment

Finally, Radovan and Criswell argue Hall failed to carry its burden because it admitted it had not sold some of the furniture, fixtures, and equipment it received in the bankruptcy, and it did not deduct the value of those assets from Radovan and Criswell's indebtedness. Hall responds that they waived any right to complain about how it treated the collateral when they agreed their obligations would not be diminished by "any impairment of any collateral securing" the loan or by the "failure of Lender to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law[.]"

Furthermore, under section five of the guaranties, Radovan and Criswell agreed that Hall was not required to enforce its remedies against any collateral before demanding payment from them:

In the event of default in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due, whether by its terms, by acceleration, or otherwise, Guarantor shall promptly pay the amount due thereon to Lender without notice or demand, of any kind or nature, in lawful money of the United States of America or perform the obligations to be performed hereunder, and *it shall not be necessary for Lender in order to enforce such payment and performance by Guarantor first*, or contemporaneously, to institute suit or exhaust remedies against Borrower or others liable on the Guaranteed Obligations, *or to enforce any rights, remedies, powers, privileges or benefits of Lender against any property covered by a lien created under the Mortgage or any other security or collateral which shall ever have been given to secure the Guaranteed Obligations.*

The Supreme Court of Texas looked at similar guaranty-agreement language in *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706 (Tex. 1990). The agreements there specified that "[t]he Creditor shall not be required to pursue any other remedies before invoking the benefits of this guaranty, especially it shall not be required to exhaust its remedies against endorsers, collateral and other security." *Id*. at 707. The court concluded that "the guaranties expressly relieved the creditor from seeking to satisfy its debt from the collateral at all." *Id*. at 710. The lender, under the guaranties, had "the right to ignore the collateral and obtain a judgment against [the guarantors] for the full amount of the debt, even if the collateral might have been sold to satisfy part of that debt." *Id*.

So, too, here: the guaranties relieved Hall from seeking to satisfy its debt from the collateral. We therefore conclude that, "[i]f Texas law implies a duty to dispose of all collateral before suing on a guaranty," Radovan and Criswell "expressly

–27–

waived [their] right[s] to insist on it." *See SEI Bus. Sys., Inc. v. Bank One Tex., N.A.*, 803 S.W.2d 838, 840 (Tex. App.—Dallas 1991, no writ).

### III.    CONCLUSION

We sustain Hall's first five appellate issues, reverse the trial court's judgment, and render judgment that Hall recover $8,610,279.02 plus post-judgment interest. We remand to the trial court to determine post-judgment interest. Because we render judgment for Hall, we do not reach its sixth issue regarding the admissibility of the bankruptcy court order. *See* TEX. R. APP. P. 47.1.

191412f.p05

/Ken Molberg/
KEN MOLBERG
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HALL CA-NV, LLC, Appellant

No. 05-19-01412-CV     V.

ROBERT RADOVAN AND
WILLIAM CRISWELL, Appellees

On Appeal from the 134th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-02395.
Opinion delivered by Justice
Molberg. Justices Carlyle and Smith
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

HALL CA-NV, LLC recover from appellees ROBERT RADOVAN and WILLIAM CRISWELL actual damages of $8,610,279.02 plus post-judgment interest.

We **REMAND** to the trial court for a calculation of post-judgment interest.

It is **ORDERED** that appellant HALL CA-NV, LLC recover its costs of this appeal from appellees ROBERT RADOVAN and WILLIAM CRISWELL.

Judgment entered this 25th day of May 2022.